**FRAUD–TECH, INCORPORATED, Dean McGee and Robert Andrews, Appellants,**

v.

**CHOICEPOINT, INC. f/k/a Database Technologies, Inc., The Information Connectivity Group, Inc., Thomas H. Hoolihan, Phillip Wamock, Andrew Perlmutter, Appellees.**

No. 2–01–347–CV.

Court of Appeals of Texas, Fort Worth.

March 27, 2003.

Rehearing Overruled May 8, 2003.

Bucholz, Sassin, & DeMaio, P.L.L.C., and Robert W. Bucholz, F. Bady Sassin, W. Charles Campbell, Dallas, for Appellants.

Herrick & Associates, P.C. and David P. Herrick, DeHay & Elliston, L.L.P., Gary D. Elliston and W. Scott Berry, Dallas, for Appellees.

Panel B: LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

## OPINION

LEE ANN DAUPHINOT, Justice.

This is a commercial dispute between Appellants Fraud–Tech, Inc. ("FTI"), Dean McGee, and Robert Andrews and Appellees ChoicePoint, Inc. f/k/a Database Technologies, Inc. ("DBT"), The Information Connectivity Group, Inc. ("ICON"), Thomas H. Hoolihan, Phillip Wamock, and Andrew Perlmutter involving the joint development of FTI's idea and concept of a fraud detection system for the mortgage industry. FTI, McGee, and Andrews appeal from the trial court's summary judgment, which was granted on Appellees' motion. We affirm in part and reverse and remand in part.

## I. Factual and Procedural Background

DBT is a Florida-based software development company that, among other services, provides tracking software to law enforcement agencies and insurance investigators. McGee and Andrews, who were both residents of Texas, approached DBT in the spring of 1998, proposing that the parties jointly develop and market a mortgage fraud detection system for the mortgage banking industry, in which mortgage banking companies could determine the legitimacy of information provided in a potential borrower's loan application. McGee and Andrews formed FTI, a Texas corporation, to facilitate the business transactions with DBT.

On March 4, 1998, Andrews, individually, entered into a nondisclosure agreement with DBT. Under the terms of the agreement, both parties agreed that they would not disseminate or use the other's confidential information for competitive purposes or for any other purpose "not in furtherance of the business relationship between them." The nondisclosure agreement also provided that, in the event of a breach or a threatened breach by either party, the "non-breaching party will have no adequate remedy in money damages and, accordingly, shall be entitled to seek an injunction against such breach." The non-breaching party was additionally entitled under the agreement to "any other legal or equitable remedies available to it."

On June 9, 1998, FTI and DBT executed a letter of intent outlining the terms of a proposed transaction whereby FTI and DBT would jointly develop and market mortgage fraud detection software. The letter of intent also provided that the terms of the nondisclosure agreement entered into by the parties on March 4, 1998 would remain in full force and effect until negotiations between the parties yielded a legally binding agreement. FTI and DBT continued to work together pursuant to the letter of intent and negotiated a draft licensing agreement. Ultimately, however, the parties never consummated the agreement contemplated by the letter of intent.

FTI filed suit on November 2, 1998 against Appellees, alleging that on October 1, 1998, Wamock and Perlmutter contacted FT Mortgage Company, a large lending institution, at its Dallas office. Wamock and Perlmutter represented to FT Mortgage that they were representatives of ICON, which was affiliated with DBT. Wamock and Perlmutter stated that they were interested in discussing FT Mortgage's interest in a new software concept being developed by DBT. FTI's petition further alleged that on October 8, 1998, Wamock and Perlmutter met with representatives of FT Mortgage at the Dallas office and disclosed that DBT and ICON were developing a system that would be used during the loan application process to

detect and identify fraud. Appellees answered and on November 12, 1998, the court entered an agreed temporary injunction, which was subsequently extended.

Appellees later filed a document titled "Defendants' Original Cross–Claim" on August 2, 1999 against Andrews and McGee, seeking temporary and permanent injunctive relief. On August 26, 1999, Andrews and McGee filed their original answer to Appellees' cross-claim.

In its fifth amended petition, filed August 28, 2000, FTI sought injunctive relief, as well as damages for fraud, conversion, breach of fiduciary duty, civil conspiracy, breach of the nondisclosure agreement, breach of the letter of intent, and breach of the application development, distribution, and license agreement ("licensing agreement"). FTI sought to prove through expert testimony that its initial investment of $10,000 in the system would have grown to $17,648,000 within five years. FTI also requested the remedy of specific performance on these agreements.

On October 2, 2000, Andrews and McGee filed their first amended answer and counterclaim to Appellees' cross-claim. The pleading included the following statement: "Cross–Defendants adopt, individually and collectively, and incorporate by reference each and every allegation and cause of action set forth in Plaintiff's Original Petition and each and every amendment and/or supplement thereof and/or thereto as if set forth herein at length verbatim."

On May 15, 2001, Appellees sought a motion for summary judgment against FTI, under rule 166a of the Texas Rules of Civil Procedure, seeking judgment as a matter of law on FTI's claims for breach of contract and civil conspiracy. Appellees also sought a no-evidence motion for summary judgment, pursuant to rule 166a(i), on the grounds that there was no evidence to support FTI's claims for breach of contract, fraud, civil conspiracy, breach of fiduciary duty, and conversion. Along with their dual motion for summary judgment, Appellees filed a motion to exclude the testimony of FTI's damages experts, Dean McGee, Dr. J. Herbert Burkman, and J. Richard Claywell.

Subsequently, on June 8, 2001, FTI filed its sixth amended petition, in which it withdrew its claims for breach of fiduciary duty and civil conspiracy and added a claim for breach of a contract implied in law regarding the licensing agreement. Appellees, however, did not amend their dual motion for summary judgment. FTI then filed a notice of partial nonsuit with prejudice as to its claims against Appellees Hoolihan, Wamock, and Perlmutter, and the trial court entered an order granting the nonsuit on June 20, 2001. The trial court later granted the remaining defendants' (Appellees ICON and DBT) motion to exclude FTI's damages experts on July 2, 2001 and their motion for summary judgment on July 24, 2001.

Because the parties were concerned with the finality of the summary judgment, the trial court received and reviewed post-judgment briefing from both sides and conducted a hearing to determine whether the judgment disposed of all parties and claims. On August 8, 2001, the trial court entered a final summary judgment, which indicated the court's intent to dispose of all claims and all parties. The summary judgment stated, in pertinent part:

It is, therefore,

ORDERED, ADJUDGED, AND DE-CREED that Defendants' counterclaims against Plaintiff Fraud–Tech, Inc. and/or its two shareholders, Robert Andrews, Individually ("Andrews"), and Dean McGee, Individually ("McGee"), are non-suited without prejudice to re-

filing of same pursuant to Defendants' notice of non-suit made in open court; it is, further,

ORDERED, ADJUDGED, AND DE-CREED that the only claims and parties remaining after Defendants' non-suit are Plaintiff Fraud–Tech's claims against Defendants by virtue of Plaintiff's Sixth Amended Original Petition filed on June 8, 2001 in which the counterclaims of Andrews and McGee were voluntarily dismissed; it is, further,

ORDERED, ADJUDGED, AND DE-CREED that Defendants are awarded final summary judgment against Plaintiff Fraud–Tech, Inc.

This appeal arises from this final summary judgment.

## II. Legal Analysis

On appeal, McGee and Andrews argue that the trial court erred in granting summary judgment because: (1) FTI's sixth amended petition did not amend away McGee and Andrews's counterclaims against Appellees; (2) the trial court's judgment cannot be affirmed on any other legal theories; (3) Appellees waived any complaint about the sufficiency of McGee and Andrews's counterclaims; and (4) the trial court erroneously ruled that McGee and Andrews's counterclaims had been voluntarily dismissed.

Additionally, FTI complains that the trial court erred in granting summary judgment because: (1) the trial court granted summary judgment on issues not presented to it during the summary judgment hearing; (2) the judgment granted more relief than Appellees requested, in that Appellees' motion for summary judgment did not address FTI's claims for specific performance or breach of a contract implied in law; (3) FTI raised a genuine issue of material fact with respect to its claims for damages; (4) the judgment was based on an erroneous decision to exclude FTI's expert witnesses on damages; and (5) FTI raised genuine issues of material fact on its claims of breach of contract, fraud, and conversion.

### A. Standard of Review

#### 1. Traditional Motion for Summary Judgment

In a summary judgment case, the issue on appeal is whether the movant met his summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.[1] The burden of proof is on the movant, and all doubts about the existence of a genuine issue of material fact are resolved against the movant.[2] Therefore, we must view the evidence and its reasonable inferences in the light most favorable to the nonmovant.[3]

In deciding whether there is a material fact issue precluding summary judgment, all conflicts in the evidence are disregarded and the evidence favorable to the nonmovant is accepted as true.[4] Evidence that favors the movant's position will not be considered unless it is uncontrovert-

1. Tex.R. Civ. P. 166a(c); *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex.1999); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979).

2. *Rhone–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex.1999); *Friendswood Dev. Co. v. McDade + Co.*, 926 S.W.2d 280, 282 (Tex. 1996); *Great Am. Reserve Ins. Co. v. San Anto-nio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex.1965).

3. *Great Am.*, 391 S.W.2d at 47.

4. *Rhone–Poulenc*, 997 S.W.2d at 223; *Harwell v. State Farm Mut. Auto. Ins. Co.*, 896 S.W.2d 170, 173 (Tex.1995).

ed.[5] The summary judgment will be affirmed only if the record establishes that the movant has conclusively proved all essential elements of the movant's cause of action or defense as a matter of law.[6]

A defendant is entitled to summary judgment if the summary judgment evidence establishes, as a matter of law, that at least one element of a plaintiff's cause of action cannot be established.[7] The defendant as movant must present summary judgment evidence that negates an element of the plaintiff's claim. Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence raising a genuine issue of material fact with regard to the element challenged by the defendant.[8] When the summary judgment order does not include the specific grounds for the ruling, the judgment may be affirmed on any meritorious theory presented in the motion.[9]

### 2. No–Evidence Motion for Summary Judgment

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense.[10] The motion must specifically state the elements for which there is no evidence.[11] The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact.[12]

A no-evidence summary judgment is essentially a pretrial directed verdict, and we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict.[13] We review the evidence in the light most favorable to the party against whom the no-evidence summary judgment was rendered, disregarding all contrary evidence and inferences.[14] If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper.[15]

### B. McGee and Andrews's Appeal

McGee and Andrews raise four issues on appeal, complaining generally about the trial court's summary judgment entered against them. Before we address McGee and Andrew's appeal, however, we first clarify the status of individual Appellees Hoolihan, Wamock, and Perlmutter.

5. *Great Am.*, 391 S.W.2d at 47.

6. *Clear Creek Basin*, 589 S.W.2d at 678.

7. *Elliott–Williams Co. v. Diaz*, 9 S.W.3d 801, 803 (Tex.1999).

8. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex.1995).

9. *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989).

10. Tex.R. Civ. P. 166a(i).

11. *Id.; In re Mohawk Rubber Co.*, 982 S.W.2d 494, 497–98 (Tex.App.-Texarkana 1998, orig. proceeding).

12. *See* Tex.R. Civ. P. 166a(i) cmt.; *Moore v. K Mart Corp.*, 981 S.W.2d 266, 269 (Tex.App.-San Antonio 1998, pet. denied); *Jackson v. Fiesta Mart, Inc.*, 979 S.W.2d 68, 71 (Tex. App.-Austin 1998, no pet.).

13. *Frazier v. Yu*, 987 S.W.2d 607, 610 (Tex. App.-Fort Worth 1999, pet. denied); *Moore*, 981 S.W.2d at 269.

14. *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex.1994).

15. *Moore*, 981 S.W.2d at 269.

During oral argument, Appellees' counsel expressed his view that these three individuals were not Appellees because FTI nonsuited its claims against them. We note, however, that while Hoolihan, Wamock, and Perlmutter are not appellees as to FTI's appeal, they are appellees as to the claims asserted by McGee and Andrews, which were not disposed of by virtue of the order on *FTI's* notice of partial nonsuit. Thus, we address McGee and Andrews's appeal as to all Appellees.

In their first issue, McGee and Andrews argue that the trial court erred in granting summary judgment as to McGee and Andrews because FTI's sixth amended petition did not amend away their counterclaims against Appellees. Following the trial court's initial entry of summary judgment, the court considered arguments concerning its judgment and entered a modified summary judgment to ensure that the order was final and appealable. The modified summary judgment expressly indicated that McGee and Andrews's counterclaims were voluntarily dismissed by virtue of FTI's sixth amended petition.

FTI is a corporate entity, separate and apart from its officers and shareholders.[16] While FTI was a party to the litigation at the time Appellees filed their "Original Cross–Claim" against McGee and Andrews, neither McGee nor Andrews were parties to the litigation. Therefore, Appellees' Original Cross–Claim against McGee and Andrews is substantively a third-party petition, as it sought relief against persons who were not parties to the litigation.[17] Because we have determined that Appel-

lees' claims against McGee and Andrews are in the nature of a third-party action, the proper focus of our inquiry is on the pleadings between Appellees and McGee and Andrews, not, as Appellees contend, on the pleadings between Appellees and FTI.

■ Appellees assert that FTI's sixth amended petition, which contains no references or allegations concerning McGee and Andrews as parties to the litigation, amended away the counterclaims of McGee and Andrews. Specifically, Appellees argue that the counterclaims were dismissed because: (1) neither McGee nor Andrews was listed as a party as required under rule 79 of the Texas Rules of Civil Procedure; (2) no allegations were made on behalf of either McGee or Andrews; and (3) the style of the case did not reference either McGee or Andrews, but rather a singular "Plaintiff."

■ Although Appellees direct us to a few of the many cases concerning dismissal by an amended pleading, we agree with McGee and Andrews that those cases are distinguishable from the case at bar. Appellees set forth the general rule that "[p]arties to a suit are just as effectively dismissed from a suit by omitting their names from an amended pleading as where a formal order of dismissal is entered."[18]

The classic example of this rule's operation is shown in *Mercure,* in which Century sued Rowland and Keim for unpaid rent.[19] Initially, Century asserted its right to sue the two defendants in its own name,

---

**16.** *See Castleberry v. Branscum,* 721 S.W.2d 270, 271 (Tex.1986); *Pabich v. Kellar,* 71 S.W.3d 500, 507 (Tex.App.-Fort Worth 2002, pet. denied) ("A corporation is a separate legal entity that normally insulates its owners or shareholders from personal liability.").

**17.** *See* Tex.R. Civ. P. 38.

**18.** *Mercure Co., N.V. v. Rowland,* 715 S.W.2d 677, 679 (Tex.App.-Houston [1st Dist.] 1986, writ ref'd n.r.e.).

**19.** *Id.* at 678.

rather than as an agent for Mecure.[20] In an amended pleading, the plaintiff was designated as "Mecure Company, N.V., by its agent Century Development Corporation."[21] In its fourth amended pleading, however, "the name of Century was dropped as a party and the plaintiff's name designated as Mecure Company, N.V."[22] The court held that when Century's name was dropped from the plaintiff's fourth amended petition, the intentional omission of its name from the pleading effectively dismissed Century from the suit.[23] All of the cases applying this dismissal rule follow in similar fashion.[24]

None of these cases, however, provide support for the trial court's ruling as to McGee and Andrews in this case, as these cases do not stand for the proposition that the amended pleading of a plaintiff can effectively dismiss the claims and/or counterclaims between a third-party plaintiff and a third-party defendant. As to the claims between Appellees and McGee and Andrews, their pleadings were never amended to drop any of the named parties.

Accordingly, we hold that the trial court erroneously ordered that FTI's sixth amended petition voluntarily dismissed McGee and Andrews's counterclaims. While Appellees' brief voices their confidence that there is no point in reversing the summary judgment only as to McGee and Andrews's counterclaims, a situation they seemingly set in motion with their purported Original Cross–Claim, we cannot affirm the trial court's summary judgment with respect to McGee and Andrews because Appellees only moved for summary judgment against FTI.[25] Given our holding that the trial court erred in dismissing their counterclaims, we sustain McGee and Andrews's first issue. We need not address McGee and Andrews's remaining issues.[26]

## C. FTI's Appeal

In five issues, FTI argues that the trial court erred in granting summary judgment. Before we reach these contentions, we address Appellees' arguments concerning the timeliness of FTI's response to Appellees' motion for summary judgment and the law governing the claims in this case.

### 1. Timeliness of FTI's Summary Judgment Response

**20.** *Id.*

**21.** *Id.*

**22.** *Id.*

**23.** *Id.* at 679.

**24.** *See Randolph v. Walker,* 29 S.W.3d 271, 274–75 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) (holding appellants' claims against two defendants were dismissed when appellants filed an amended petition that did not include the two defendants); *Hanmore Dev. Corp. v. JBK Enters.,* 776 S.W.2d 738, 740 (Tex.App.-Corpus Christi 1989, writ denied) (holding that plaintiff's claims against defendant HDC were dismissed when the plaintiff's first through fourth amended pleadings failed to name HDC as a party and limitations barred recovery when the plaintiff renamed HDC in its fifth amended pleading);

*Radelow–Gittens Real Prop. Mgmt. v. Pamex Foods,* 735 S.W.2d 558, 560 (Tex.App.-Dallas 1987, writ ref'd n.r.e.) (holding that "Radelow–Gittens effectively dismissed Pamex from the lawsuit at the point when it amended its pleadings and omitted all claims of liability against Pamex"); *Burton v. Bridges,* 641 S.W.2d 635, 637 (Tex.App.-El Paso 1982, writ ref'd n.r.e.) ("Since Burton was not named in the amended petition, he was not a party to the suit at the time the judgment was entered.").

**25.** *See Lehmann v. Har–Con Corp.,* 39 S.W.3d 191, 200 (Tex.2001) ("A judgment that grants more relief than a party is entitled to is subject to reversal.").

**26.** *See* Tex.R.App. P. 47.1.

Appellees first argue that we can affirm the summary judgment because FTI's response to the defendants' motion for summary judgment was untimely filed. Appellees contend that we should conclusively presume that FTI's late-filed response was not considered by the trial court because nothing appears of record to indicate that the late filing of FTI's response was with leave of court. We disagree.

Generally, rule 166a requires a response to a motion for summary judgment to be filed at least seven days before the hearing on the motion.[27] In this case, the summary judgment hearing was set for June 15, 2001. Accordingly, FTI's response was due on or before Friday, June 8, 2001.[28] FTI did not file its response until Monday, June 11, 2001; however, Appellees conceded at the summary judgment hearing and in their brief to this court that the parties signed and filed a written Rule 11 agreement, giving FTI until June 11 to file its response.

Neither of the cases cited by Appellees holds that a Rule 11 agreement cannot extend a summary judgment deadline unless a party also receives additional leave of court.[29] In fact, both *Goswami* and *Gilchrist* are distinguishable from the case at bar because neither addresses whether a Rule 11 agreement can extend the deadline for filing a summary judgment response.[30] Rather, parties may alter the deadline for filing a response by Rule 11 agreement.[31] We hold that FTI's response was properly before the trial court.

## 2. Choice of Law

We must also address the choice of law issues raised by FTI before considering FTI's appeal. FTI argues that Florida law governs all three purported contracts. Appellees, on the other hand, argue that choice of law is not an issue in this appeal because the court may assume that Florida and Texas law are the same since FTI has not articulated a difference.

The three purported agreements that form the basis for FTI's contractual claims each contain a choice of law clause. The nondisclosure agreement states that it is to be governed by Delaware law, while the letter of intent and the licensing agreement both state that they are to be governed under Florida law. Additionally, the letter of intent purports to incorporate by reference the nondisclosure agreement.

Before undertaking a choice of law analysis, we look to whether a conflict of law exists.[32] If no conflict of law exists

27. Tex.R. Civ. P. 166a(c).

28. *See id.*

29. *See Goswami v. Metro. Sav. & Loan Ass'n,* 751 S.W.2d 487, 491 (Tex.1988); *Gilchrist v. Bandera Elec. Coop.,* 966 S.W.2d 716, 718 (Tex.App.-San Antonio 1998, no pet.).

30. *Goswami,* 751 S.W.2d at 491; *Gilchrist,* 966 S.W.2d at 718.

31. *See EZ Pawn Corp. v. Mancias,* 934 S.W.2d 87, 91 (Tex.1996) (discussing use of Rule 11 agreement to extend deadline for filing a response to a motion to compel arbitration); *see also Rabe v. Guar. Nat'l Ins. Co.,* 787 S.W.2d 575, 580 (Tex.App.-Houston [1st Dist.] 1990,

writ denied) (stating, with respect to the insured's late filing of his response to the insurer's motion for summary judgment, "There is no written agreement for an extension in the record as required by Tex.R. Civ. P. 11."); Timothy Patton, Summary Judgments in Texas, § 2.02 (3d ed.2002).

32. *See Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 419 (Tex.1984) (determining that, before undertaking choice of law analysis, the court "must first determine whether there is a difference between the rules of Texas and New Mexico on this issue"); *Young Refining Corp. v. Pennzoil Co.,* 46 S.W.3d 380, 385 (Tex.App.-Houston [1st Dist.] 2001, pet. denied) (finding no necessity to decide which

on the issues, we need not decide which state's law applies.[33] Nothing appears in the record indicating which state's law the trial court applied, nor does either party argue that the trial court applied the wrong law.

We note that despite FTI's argument that Florida law applies to its contract claims, during all stages of this litigation, FTI has consistently sought application of Texas law with respect to the recovery of lost profits damages. For example, FTI's response to Appellees' motion to exclude FTI's damages experts only cites Texas law and states, "The amount of claimed lost profits must be shown by competent evidence with reasonable certainty." [34] Likewise, in its appellate brief, FTI urges this court, under the heading "Applicable Law," that *Texas Instruments* governs with respect to the recovery of lost profits.[35] Because FTI did not plead, prove, or otherwise avail itself of Florida law with respect to the recovery of lost profits, we assume there is no difference between the law of Florida and Texas concerning the recovery of lost profits, and we apply Texas law.[36]

Moreover, as discussed below, FTI has not shown a difference between Texas and Florida law concerning the dispositive issues in its appeal. We, therefore, need not decide the choice of law issues raised by FTI because there is no conflict of law on the issues presented by FTI.[37]

### 3. Issues Submitted at the Summary Judgment Hearing

FTI complains in its first issue that the trial court erred in granting summary judgment on issues not submitted to the court during the summary judgment hearing. First, FTI states that there was no hearing. Second, FTI claims that, even if there was a summary judgment hearing, the court committed reversible error because the only issue submitted during the hearing concerned damages.

The record clearly indicates that on June 15, 2001, the trial court conducted a hearing on Appellees' motion to exclude FTI's damages experts and on Appellees' motion for summary judgment. The court also heard further arguments concerning Appellees' motion to exclude on June 28, 2001. During the hearing FTI's counsel stated:

> [W]ith regard to the motion for summary judgment, it's my understanding ... that the only issue they were moving on, in essence, or attacking was the issue of damages. And, of course, they'll correct me if I'm wrong. So that if you excluded the expert's testimony, i.e., in reliance—to rely on damages, then, in essence it ix-nays that element

---

state's law applied absent a conflict of law on the issues presented); *St. Paul Surplus Lines Ins. Co. v. Geo Pipe Co.*, 25 S.W.3d 900, 903 n. 2 (Tex.App.-Houston [1st Dist.] 2000, no pet.) (op. on reh'g) ("In the absence of a true conflict of law, we do not undertake choice of law analysis.").

**33.** *See Young Refining Corp.*, 46 S.W.3d at 385; *St. Paul Surplus Lines Ins. Co.*, 25 S.W.3d at 903 n. 2.

**34.** *See Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994).

**35.** *Id.*

**36.** *See Gevinson v. Manhattan Constr. Co.*, 449 S.W.2d 458, 465 n. 2 (Tex.1969); *Pittsburgh Corning Corp. v. Walters*, 1 S.W.3d 759, 769 (Tex.App.-Corpus Christi 1999, pet. denied); *Stine v. Koga*, 790 S.W.2d 412, 414 (Tex.App.-Beaumont 1990, writ dism'd by agr.); *Jack H. Brown & Co. v. Northwest Sign Co.*, 718 S.W.2d 397, 398 (Tex.App.-Dallas 1986, writ ref'd n.r.e.).

**37.** *See Young Refining Corp.*, 46 S.W.3d at 385; *St. Paul Surplus Lines Ins. Co.*, 25 S.W.3d at 903 n. 2.

of our causes of action, and then is the grant of summary judgment.

. . . .

Am I mistaken in what I think where we're at in this?

In response, the court and Appellees' counsel replied:

THE COURT: Well, but he's got [Hoolihan, Wamock, and Perlmutter].

[APPELLEES' COUNSEL]: Except for the three individuals.

As FTI points out in its brief, the ensuing discussion centered largely on these three individual defendants. FTI claims that it never agreed to submit the entire motion for summary judgment to the trial court for ruling without a hearing and also that nothing in the record indicates that the trial court intended to take such action.

■ To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion.[38] If a party fails to do this, error is not preserved, and the complaint is waived.[39] The objecting party must get a ruling from the trial court. This ruling can be either express or implied.[40]

■ Here, FTI did not object at the summary judgment proceeding to the scope of issues submitted and raised the issue for the first time in its motion to modify judgment and for new trial, filed after the court entered the modified summary judgment. Appellees correctly point out that while rule 166a(c) of the Texas Rules of Civil Procedure calls for a hearing on a motion for summary judgment, the Texas Supreme Court has stated that an oral hearing is not mandatory.[41] Even so, we do not address FTI's contention on this issue because we hold that FTI waived the right to complain of any error regarding the scope of issues submitted at the summary judgment hearing by failing to make a timely objection.[42] We overrule FTI's first issue.

### 4. Exclusion of FTI's Expert Testimony on Damages

In its third and fourth issues, FTI complains that the trial court erred in granting summary judgment because the judgment was based on the erroneous decision to exclude FTI's expert testimony on damages, which FTI contends raises a genuine issue of material fact on the issue of damages. Appellees respond that the trial court properly excluded FTI's expert testimony on damages, which left FTI without any evidence of damages as to its causes of action. We agree that the trial court did not abuse its discretion in excluding FTI's expert testimony on damages.

In their no-evidence motion for summary judgment, Appellees, in part, moved for summary judgment as to FTI's contractual, fraud, and conversion claims on the ground that there was no evidence of damages. On the same day on which they filed their dual motion for summary judgment, Appellees also filed a motion to exclude FTI's damages experts. As part of their motion to exclude, Appellees attached the affidavit of their own expert Marta McCall. FTI's response to Appellees' no-

---

**38.** TEX.R.APP. P. 33.1(a); *see also* TEX.R. EVID. 103(a)(1).

**39.** *Bushell v. Dean,* 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g).

**40.** *Frazier,* 987 S.W.2d at 610.

**41.** *See* TEX.R. CIV. P. 166a(c); *Martin v. Martin, Martin & Richards, Inc.,* 989 S.W.2d 357, 359 (Tex.1998); *see also* PATTON, *supra* note 31, § 7.01.

**42.** *See* TEX.R.APP. P. 33.1(a).

evidence motion for summary judgment included only two paragraphs regarding the alleged injury suffered:

### V. Fraud

. . . .

E. Injury

4.16 An injury is suffered when a legal liability or obligation is incurred that is different from the one represented or contracted for. [FTI] was represented that its confidential information would remain its own property and that such confidential information would not be used by DBT for the purposes of competing with [FTI]. Additionally, [FTI] was represented that it would be the exclusive distributor of its product to the mortgage industry. Because of these misrepresentations, Plaintiff has suffered economic damages in the amount of $17,648,000.00.

4.17 These damages are evidenced by Dr. Burkman who is an economist, with a background in corporate economic analysis, academic instructions and research. His testimony will evidence the valuation of Plaintiff's business, product, and services, its marketability and the existing market and demand for such product during the time period made the basis of Plaintiff's claims, had Defendants performed their representations as promised. The documents relied upon by Dr. Burkman and his expert report evidence the injury caused to Plaintiff.

(footnotes omitted).

As summary judgment evidence, FTI attached Dr. Burkman's expert report, which incorporated J. Richard Claywell's expert report, which was based, in part, on information provided by Appellant McGee, who FTI also proffered as an expert in mortgage fraud. Dr. Burkman opined:

Using regression analysis to forecast the average number of loans between 1999 and 2003, the expected penetration of the mortgage loan market by Fraud–Tech, and consequently, the expected number of loans served by its fraud management system, the Claywell report conservatively concludes that over this five year period the company can expect to lose $17,648,000.

Claywell's expert report likewise stated, "In my expert opinion, [FTI] has suffered $17,648,000 in damages as a result of the alleged allegations in this suit."

FTI asserts that Claywell's report lists one entry for lost profits ($10,638,966) and another figure for the value of FTI as a business after five years ($7,008,621). As a result, FTI contends that Appellees have only challenged lost profits damages and not valuation of the business, a distinction, which FTI claims, allows it to circumvent Appellees' motion to exclude as to damages related to business value. FTI concedes, however, that Dr. Burkman testified that the amount of lost profits is a factor which goes into valuing a business.[43] Assuming this to be true, if FTI fails to meet its evidentiary burden with respect to its claimed lost profits damages, FTI's expert testimony will likewise be unable to establish the damages based on the projected value of the business.

As part of its response to Appellees' motion to exclude, FTI attached the affidavit of Dean McGee, which was sworn and

**43.** *See City of San Antonio v. Guidry*, 801 S.W.2d 142, 150 (Tex.App.-San Antonio 1990, no writ) (stating that recovery of both lost profits and loss of business value for the same time period would be duplicative); *Trailer Ranch, Inc. v. Levine*, 523 So.2d 629, 631 (Fla.Dist.Ct.App.1988) ("[R]ecovery for loss of a business venture is to be measured either by lost profits or loss of business value, but not both.").

subscribed to two days before FTI filed the response. After reviewing the pleadings and evidence filed, and after conducting two hearings on Appellees' motion to exclude FTI's damages experts, the court granted Appellees' motion to exclude McGee, Claywell, and Dr. Burkman.

### a. Law Governing Expert Opinion Evidence

■■■■ For an expert's testimony to be admissible under Texas Rule of Evidence 702, the party offering the expert's testimony bears the burden of proving that the witness is qualified, that the expert's opinion is relevant to the issues in the case, and that the opinion is based upon a reliable foundation.[44] We review a trial court's exclusion of expert testimony under an abuse of discretion standard.[45] The exercise of discretion is within the sole province of the trial court, and this court may not substitute its discretion for that of the trial court.[46] A trial court abuses its discretion when its ruling is arbitrary, unreasonable, or without reference to any guiding rules or legal principles.[47] Because the trial court did not specify the ground on which it excluded FTI's expert testimony on damages, we will affirm the trial court's ruling if any ground is meritorious.[48]

### b. Law Governing Evidence of Lost Profits Damages

■■■■ A party seeking recovery for lost profits must prove those profits by competent evidence with reasonable certainty.[49] The Texas Supreme Court has emphasized that the requirement that lost profits be proved with reasonable certainty is intended to be flexible enough to accommodate the myriad circumstances in which claims for lost profits arise.[50] What constitutes reasonably certain evidence of lost profits is a fact-intensive determination.[51] The focus is on the experience of the persons involved in the enterprise, the nature of the business activity, and the relevant market.[52] At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained.[53] Mere speculation by the plaintiff does not constitute objective information needed to establish lost profits.[54]

■■■■ Reasonable certainty is not demonstrated when the profits claimed to be lost are largely speculative, as from an

---

44. Tex.R. Evid. 702; *Guadalupe–Blanco River Auth. v. Kraft,* 77 S.W.3d 805, 807 (Tex.2002); *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 720 (Tex.1998); *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex.1995).

45. *See K-Mart Corp. v. Honeycutt,* 24 S.W.3d 357, 360 (Tex.2000); *Gammill,* 972 S.W.2d at 718–19.

46. *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 918 (Tex.1985).

47. *Honeycutt,* 24 S.W.3d at 360.

48. *See id.; Bradley v. State ex rel. White,* 990 S.W.2d 245, 247 (Tex.1999).

49. *Tex. Instruments,* 877 S.W.2d at 279; *VingCard A.S. v. Merrimac Hospitality Sys.,*

*Inc.,* 59 S.W.3d 847, 863 (Tex.App.-Fort Worth 2001, pet. denied) (op. on reh'g).

50. *Tex. Instruments,* 877 S.W.2d at 279.

51. *Szczepanik,* 883 S.W.2d at 649; *SBC Operations, Inc. v. Bus. Equation, Inc.,* 75 S.W.3d 462, 467 (Tex.App.-San Antonio 2001, pet. denied).

52. *Tex. Instruments,* 877 S.W.2d at 280; *Ishin Speed Sport, Inc. v. Rutherford,* 933 S.W.2d 343, 351 (Tex.App.-Fort Worth 1996, no writ).

53. *Szczepanik,* 883 S.W.2d at 649.

54. See *Holt Atherton Indus. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992).

activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unviable markets, or on the success of new and unproven enterprises.[55] Factors like these and others that make a business venture risky in prospect preclude recovery of lost profits in retrospect.[56] When there are firmer reasons to expect a business to yield a profit, however, recovery for profits allegedly lost will not be denied simply because the business is new.[57]

### c. Discussion

Much of FTI's brief and response to Appellees' motion to exclude is a seeming attempt to shift its burden of proving the admissibility of Dr. Burkman's testimony.[58] Accordingly, FTI incorrectly argues that the preponderance of the evidence standard, along with case law and the trial court's scheduling order, demonstrates that *Appellees* had a burden to present evidence showing that FTI's experts are unreliable. Our focus, rather, is on whether *FTI* satisfied the standards promulgated in rule 702, *Robinson,* and its progeny.[59]

In its brief, FTI contends that it is important to understand that much of the information used by Claywell and Dr. Burkman regarding the mortgage industry, mortgage fraud, market share, and

costs came from McGee; therefore, they argue this case turns on the testimony of McGee. For example, Dr. Burkman's expert report incorporates by reference the opinions of Claywell, which were based, in large part, on information provided by McGee. FTI counters Appellees' challenge to the admissibility of Dr. Burkman by arguing that FTI has shown that McGee is reliable, which establishes Claywell's reliability. FTI further reasons that since McGee and Claywell are reliable, so too is Dr. Burkman. For the following reasons, we disagree.

■■■ Appellees present five independent grounds by which we can uphold the trial court's exclusion of FTI's expert testimony. Assuming *arguendo* that FTI's experts are qualified, we will address Appellees' contention that the trial court did not abuse its discretion in excluding FTI's expert testimony because it was not based upon a reliable foundation, but rather on the *ipse dixit* testimony of McGee.[60]

As FTI acknowledges, one of Appellees' chief complaints regarding FTI's expert testimony is that since FTI's market projections are faulty, any opinions based on those assumptions are consequently unreliable. Appellees attack Claywell's report, which concludes that the estimated market share would have been 5% in 1999, 7.5% in 2000, 10% in 2001, and 15% in both 2002

---

55. *Tex. Instruments,* 877 S.W.2d at 279; *VingCard A.S.,* 59 S.W.3d at 863.

56. *Tex. Instruments,* 877 S.W.2d at 279; *SBC Operations, Inc.,* 75 S.W.3d at 467.

57. *Tex. Instruments,* 877 S.W.2d at 280 ("The fact that a business is new is but one consideration in applying the 'reasonable certainty' test.").

58. *See Robinson,* 923 S.W.2d at 557 ("Once the party opposing the evidence objects, the proponent bears the burden of demonstrating its admissibility.").

59. *See* TEX.R. EVID. 702; *Robinson,* 923 S.W.2d at 556.

60. *See* BLACK'S LAW DICTIONARY 833 (7th ed.1999) (stating that the term *"ipse dixit"* means "[s]omething asserted but not proved" and is literally translated "he himself said it"); *see also Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997); *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999) ("An expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must explain the basis of his statements to link his conclusions to the facts.").

and 2003. Claywell's report explains these assumptions:

> The estimated market share of [FTI] is based on conversations with Mr. Chris Perrucci and Mr. Dean McGee. Mr. Chris Perrucci, Director of Business Development, estimated that the introduction of the [FTI] program into the industry could capture approximately 10% to 25% of the market. Mr. Dean McGee was not as optimistic as Mr. Perrucci and felt that the market share would grow at a slower rate. I have used a lower market capture rate to be more reasonable as to the introduction of a new product into the market place.

Appellees argue that this statement does nothing to justify the assumption that FTI would have ultimately attained a 15% market share, nor does it explain how McGee defended his projected market share of 5% in year one, which he felt would grow to 15% in year four.

During the *Daubert/Robinson* hearing, the following exchange occurred between Appellees' counsel and Dr. Burkman concerning the market share projections:

> Q. To your knowledge, has anyone other than Mr. McGee done a survey of this market?
>
> A. No.
>
> Q. To your knowledge, are there other entities out there for hire that could have done the survey of this market?
>
> A. Yes, there are.
>
> Q. Did Fraud–Tech—
>
> A. My firm could have done that.
>
> Q. Were you asked to do that?
>
> A. I was not asked to do that.
>
> Q. You were given those assumptions by Mr. McGee, correct?
>
> A. Yes.

> Q. Did Fraud–Tech ever develop a marketing budget for the concept developed by Mr. McGee?
>
> A. I don't know that.
>
> Q. Did Fraud–Tech ever have a business plan created for the concept developed by Mr. McGee?
>
> A. I believe it did not.
>
> Q. In addition to the assumption of a 5 percent estimated market share in the first year, Mr. Claywell further projects there will be an increased market share gained by Fraud–Tech's concept in future years; isn't that true?
>
> A. He does.
>
> Q. And as you sit here today, you have no information whether there will be competing products that might come on line between the year 2000 and 2003 that might actually reduce rather than increase Fraud–Tech's market share; isn't that true?
>
> A. Yes. There could very well be a new entry into the market that would destroy Fraud–Tech.

The trial court later questioned Dr. Burkman about the market share projections, and Dr. Burkman testified:

> I don't have any ability, I think ... to really know what would be the range of share. I think it could be low. It could be one or two percent, it could be 60.... [I]f Fannie Mae becomes a client of Fraud–Tech's, then this report is ridiculously low in value.

Shortly thereafter, FTI's counsel asked Dr. Burkman why the estimated 5% market share was reasonable, to which Dr. Burkman replied:

> I have to assume that Mr. McGee's product is capable of doing what it [sic] said it did. Does 5 percent seem absurd? In fact, it seems very reasonable. [FTI's Counsel]: Does it, in your opinion, seem low?

[Dr. Burkman]: Well, I guess I'd rather err on the side of being conservative. I mean, if I said 25 percent, I might be right. But, you know, we really don't know, and I suspect with ... start-up companies, you just don't really know.

FTI concedes that the damages model used by Dr. Burkman and McGee is very conservative and likely underestimates both total losses and losses due to fraud. FTI argues that getting a contract with either Fannie Mae or Freddie Mac would have immediately given FTI more than 15% of the market, and DBT sales representative Stephen Vereb's testimony that the two organizations were cooperating on fraud issues showed a *good possibility* that both of them would have used FTI's system. Further, FTI contends that the experience of McGee is a firm reason why FTI could have expected to turn a profit, and that he had a sound plan for developing the fraud detection system with Appellees and marketing that system to Fannie Mae and Freddie Mac, which control 70% of the lending market, according to McGee.

Marta McCall, Appellees' expert on damages, stated that "[n]one of Fraud–Tech's competitors have achieved a market share of anywhere near 5 percent even though these competitors had resources vastly superior to those of Fraud–Tech and have been in business for several years and are known in the industry." In McGee's affidavit, provided in support of FTI's response to Appellee's motion to exclude FTI's damages experts, McGee spent considerable effort refuting the figures and statements in McCall's affidavit.

McGee, however, never discussed his conversations with Claywell, nor did he attempt to explain his market share projections or objectively justify how he reached his conclusions. Rather, McGee claimed that his intention was to market the FTI system to Freddie Mac and Fannie Mae, with whom McGee said he had held discussions "to do the beta testing of the system."

Appellees' motion to exclude states that "the only foundation for Claywell's opinion is his unidentified discussions with McGee. Likewise, the only foundation for [Dr.] Burkman's opinion is the Claywell Report. In short, this testimony constitutes nothing more than *ipse dixit* testimony held to be inadmissible."

We again stress that once Appellees challenged the expert testimony of McGee, *FTI*, as the proponent of McGee's testimony, bore the burden of proving its admissibility under rule 702.[61] FTI did not meet this burden. The record does not objectively and verifiably demonstrate the likelihood of any company utilizing FTI's system. Likewise, the record is devoid of any objective facts, figures, or data upon which McGee based his opinions regarding the market share and growth rate of FTI's fraud detection system.[62]

We need not address the other grounds Appellees raise concerning the exclusion of FTI's damages experts because we conclude that FTI did not establish the reliability of McGee's *ipse dixit* opinions concerning market share projections, assumptions fundamental to both Claywell's and Dr. Burkman's expert opinions.[63] Ac-

---

61. *See* Tex.R. Evid. 702; *Robinson*, 923 S.W.2d at 557.

62. See *Szczepanik*, 883 S.W.2d at 649.

63. *See Tex. Instruments*, 877 S.W.2d at 281; *Holland v. Hayden*, 901 S.W.2d 763, 766 (Tex. App.-Houston [14th Dist.] 1995, writ denied) (holding that the evidence was insufficient to support an award for lost profits because the jury "had only the subjective and conclusory opinion of an interested party, which, without any objective basis, could have just as easily been set much higher or lower").

cordingly, we hold that the trial court did not abuse its discretion in granting Appellees' motion to exclude the testimony of FTI's damages experts.

We further conclude that because the trial court properly excluded the testimony of McGee, Claywell, and Dr. Burkman, FTI failed to meet its summary judgment burden to prove damages for its breach of contract, fraud, and conversion claims.[64] We overrule FTI's third and fourth issues.

### 5. Summary Judgment: More Relief Granted than Requested

FTI argues in its fifth issue that summary judgment was improper because it raised genuine issues of material fact as to its claims for breach of contract, fraud, and conversion. In its second issue, FTI argues that the trial court erred in granting Appellees' motion for summary judgment because the summary judgment granted more relief than Appellees requested, in that Appellees' motion for summary judgment did not address FTI's claim for breach of a contract implied in law concerning the licensing agreement or FTI's request for specific performance on the licensing agreement.

With respect to FTI's fraud and conversion claims, FTI only requested re-lief in the form of damages. As to FTI's contract claims, it sought both legal and equitable relief, in the form of damages and specific performance. Because we have held that FTI did not meet its summary judgment burden regarding damages, summary judgment was proper as to FTI's claims for breach of the nondisclosure agreement, breach of the letter of intent, fraud, and conversion.[65] Likewise, we hold that summary judgment was proper on FTI's claim for breach of the licensing agreement with respect to FTI's requested damages.[66]

Because FTI also requested specific performance on the licensing agreement, we address whether genuine issues of material fact exist regarding the formation of an actual agreement between the parties. FTI conceded during oral argument that Appellees did not sign the licensing agreement, but FTI argues that genuine issues of material fact exist concerning whether there was an offer and an acceptance.[67]

FTI argues that Appellees' conduct involving the licensing agreement demonstrated that the parties had formed a contract implied in fact.[68] We have previously stated:

---

**64.** *See Tex. Instruments,* 877 S.W.2d at 281 (holding evidence of lost profits legally insufficient to support jury's finding).

**65.** *See* Tex.R. Civ. P. 166a(i); *Weiss v. Mech. Associated Servs., Inc.,* 989 S.W.2d 120, 124 (Tex.App.-San Antonio 1999, pet. denied). We note that on appeal FTI only complains that Appellees' motion for summary judgment failed to address FTI's request for specific performance on the licensing agreement. FTI, therefore, has waived any complaint regarding whether the summary judgment is proper as to its request for specific performance on the nondisclosure agreement and the letter of intent. *See* Tex.R.App. P. 38.1.

**66.** *See* Tex.R. Civ. P. 166a(i); *Weiss,* 989 S.W.2d at 124.

**67.** *See Harco Energy, Inc. v. Re–Entry People, Inc.,* 23 S.W.3d 389, 392 (Tex.App.-Amarillo 2000, no pet.) ("For a contract to exist, there must be an offer, an acceptance, and valid consideration."); *Mettler, Inc. v. Ellen Tracy, Inc.,* 648 So.2d 253, 255 (Fla.Dist.Ct.App. 1994) (stating elements of a valid contract are offer, acceptance, and consideration).

**68.** *See Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.,* 480 S.W.2d 607, 609 (Tex.1972) (stating that a contract implied in fact arises from the acts and conduct of the parties, it being implied from the facts and circumstances); *Commerce P'ship 8098 L.P. v. Equity Contracting Co.,* 695 So.2d 383, 385 (Fla.Dist.Ct.App.1997) ("A contract implied in fact is one form of an enforceable

[E]ven if an offer and acceptance are not recorded on paper, dealings between parties may result in an implied contract where the facts show that the minds of the parties met on the terms of the contract without any legally expressed agreement. Accordingly, the parties' conduct may convey an objective assent to the terms of an agreement, and whether their conduct evidences their agreement is a question to be resolved by the finder of fact. If the finder of fact determines that one party reasonably drew the inference of a promise from the other party's conduct, then that promise will be given effect in law.[69]

FTI points out that during DBT employee Perrucci's deposition, Perrucci stated that, on August 20, 1998, he shipped an unsigned draft of the licensing agreement to FTI for its signature. Perrucci also stated that Robert Andrews (of FTI) wanted the contract signed and that George Bruder (of DBT) told Perrucci: "Send [Andrews] the draft. If he will sign it, we'll sign it, and that's what I told [Andrews]." FTI signed the licensing agreement, but Appellees never did.

In his deposition, McGee testified that at the end of August 1998, after FTI had signed the licensing agreement, he met with Beth Kruse–Levy (of DBT) on one occasion for four or five hours discussing the ideas and concept of the fraud detection system, so that Kruse–Levy could begin to implement the project as project manager.

McGee also testified that in September he met with Bruder, Perrucci, and Andrews in an attempt to get Appellees to sign the licensing agreement and to find out why they had not yet signed it. McGee testified that revisions were made to the contract, stating: "There were some very specific words written into the contract." McGee also stated that he later spoke with Kruse–Levy, who purportedly told him that "she was under the impression that [they] should continue to go on with the project because it was a done deal, and she didn't really feel like ... having a signed contract was a relevant issue as far as continuing with the transaction." According to McGee, Kruse–Levy wanted to continue on because of the time constraints of the contract. Likewise, during Andrews's deposition, Andrews testified that Perrucci said: "I don't know why he hasn't signed [the licensing agreement]. He has agreed to sign it. But just—let's just keep going. We'll get it done." McGee testified that he continued developing a data dictionary for the project up until October 8, 1998, when the meeting occurred at FT Mortgage that prompted this lawsuit.

FTI contends that both sides were acting within the time frames of the licensing agreement and pursuant to its terms, and that such conduct raised genuine issues of material fact that the licensing agreement constituted a contract implied in fact. We agree that the trial court erroneously

---

contract; it is based on a tacit promise, one that is inferred in whole or in part from the parties' conduct, not solely from their words."); see also RESTATEMENT (SECOND) OF CONTRACTS § 4 (1981) ("A promise may be stated in words either oral or written, or may be inferred wholly or partly from conduct.").

**69.** *Ishin Speed Sport,* 933 S.W.2d at 348 (citations omitted); see also *Commerce P'ship,* 695 So.2d at 385–86 ("[A][c]ourt should deter-

mine and give to the alleged implied contract 'the effect which the parties, as fair and reasonable men, presumably would have agreed upon if, having in mind the possibility of the situation which has arisen, they had contracted expressly thereto.' "); *Mecier v. Broadfoot,* 584 So.2d 159, 160 (Fla.Dist.Ct.App.1991) (stating that the issue of whether a contract implied in fact existed should be submitted to a jury).

granted summary judgment on FTI's claim for specific performance on the licensing agreement because genuine issues of material fact exist as to whether the agreement constituted a contract implied in fact.[70]

In addition, FTI's sixth amended petition added a claim that Appellees' actions concerning the licensing agreement afforded FTI recovery under a contract implied in law theory.[71] Under both Texas and Florida law, a contract implied in law, or a quasi contract, is distinguishable from a true contract because a quasi contract is a legal fiction, an obligation imposed by law regardless of any actual agreement between the parties.[72] While it is generally true that a party cannot recover under a quasi contract theory when there is an express contract covering the subject matter of the parties' dispute, a litigant may plead and seek to recover under both theories and then recover in accordance with the evidence presented.[73]

During oral argument, Appellees conceded that they did not amend or supplement their motion for summary judgment to address FTI's claim based on a contract implied in law. Under rule 166a(i), a no-evidence motion for summary judgment must specifically "state the elements as to which there is no evidence," and there may be no "conclusory motions or general no-evidence challenges to an opponent's case."[74] While a plaintiff may not avoid a no-evidence summary judgment simply by filing an amended claim, if the amended pleading raises a new theory of liability—rather than merely reiterating the same essential elements of that party's original claims in another fashion—then summary judgment cannot be granted as to those new theories of liability.[75]

In this case, FTI's sixth amended petition added a claim raising a new theory of liability based on a contract implied in law, and Appellees never moved for summary judgment on that theory. Accordingly, we hold that summary judgment should not have been granted as to FTI's newly added quasi contractual theory.[76] We sustain FTI's fifth issue, and we overrule in part and sustain in part its second issue.

## III. Conclusion

Having sustained McGee and Andrew's first issue, we reverse the summary judgment insofar as it disposed of McGee and Andrews's counterclaims against Appellees and remand those claims for proceedings

70. *See Ishin Speed Sport*, 933 S.W.2d at 348; *Mecier*, 584 So.2d at 160.

71. *See Mowbray v. Avery*, 76 S.W.3d 663, 679 (Tex.App.-Corpus Christi 2002, pet. denied); *Nagel v. Ky. Cent. Ins. Co.*, 894 S.W.2d 19, 21 (Tex.App.-Austin 1994, writ denied); *Commerce P'ship*, 695 So.2d at 386.

72. *See Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex.2000); *Commerce P'ship*, 695 So.2d at 386.

73. *See* Tex.R. Civ. P. 48; *Fortune Prod. Co.*, 52 S.W.3d at 684; *Kovtan v. Frederiksen*, 449 So.2d 1, 1 (Fla.Dist.Ct.App.1984) (per curiam); *see also* 14 Tex. Jur. 3d. *Contracts* § 11 (1997).

74. Tex.R. Civ. P. 166a(i) and cmt.; *Specialty Retailers, Inc. v. Fuqua*, 29 S.W.3d 140, 147 (Tex.App.-Houston [14th Dist.] 2000, pet. denied).

75. *Specialty Retailers*, 29 S.W.3d at 147; *see also Lampasas v. Spring Ctr., Inc.*, 988 S.W.2d 428, 436–37 (Tex.App.-Houston [14th Dist.] 1999, no pet.) (holding summary judgment was proper even as to claims in an amended petition because "the amended petition merely reiterates the same essential elements in another fashion, and the motion for summary judgment adequately covers these new variations"); Patton, *supra* note 31, § 5.03[2][b].

76. *See Lampasas*, 988 S.W.2d at 436–37.

consistent with this opinion. Further, based on our rulings concerning FTI's appeal, we reverse the summary judgment and remand only with respect to whether FTI may seek specific performance on the licensing agreement or recovery under its theory of a contract implied in law. We affirm the summary judgment in all other respects.