

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-13-00339-CV

| | |
|---|---|
| ACADIA HEALTHCARE COMPANY, INC.; PSYCHIATRIC RESOURCE PARTNERS, INC.; MICHAEL A. SAUL; TIMOTHY J. PALUS; PETER D. ULASEWICZ; BARBARA H. BAYMA; AND JOHN M. PIECHOCKI | APPELLANTS AND APPELLEES |

V.

| | |
|---|---|
| HORIZON HEALTH CORPORATION | APPELLEE AND APPELLANT |

----------

FROM THE 16TH DISTRICT COURT OF DENTON COUNTY
TRIAL COURT NO. 2011-10846-16

----------

## OPINION ON REHEARING

----------

Horizon Health Corporation (Horizon) moved for a rehearing of this panel's February 26, 2015 memorandum opinion and judgment. *See* Tex. R. App. P. 49.1. We grant the motion, withdraw our February 26, 2015 memorandum

opinion and judgment, and substitute the following.  We dismiss Horizon's motion for en banc reconsideration as moot.  *See Tex. Dep't of Public Safety v. Nail*, 305 S.W.3d 673, 674 (Tex. App.—Austin 2010, no pet.) (op. on reh'g).

This appeal raises multiple questions involving a trial court's judgment based on the jury's answers to a 55-page charge.  We are asked to review alleged jury-charge error, the sufficiency of the evidence to support the jury's findings, exemplary damages, attorneys' fees, and how preservation of error or lack thereof can affect our review of all of these issues.  Because we conclude the evidence is legally insufficient to support future lost-profits damages and because exemplary damages may not be awarded jointly and severally under the facts of this case, we reverse those portions of the trial court's judgment.  Because we also substantially reduce the exemplary-damages award based on the reduction of compensatory damages upon a suggestion of remittitur, we reverse the issue of attorneys' fees and remand that issue for a new trial.  Otherwise, we will affirm the remainder of the trial court's judgment subject to our suggestion of a remittitur regarding exemplary damages.

## I.  BACKGROUND

### A.  HORIZON AND PROJECT SHAMROCK

Horizon Mental Health Management, Inc. was formed in 1981 to manage mental-health programs for healthcare entities such as hospitals.  In 2007, Horizon Mental Health Management, Inc. became Horizon Health Corporation

2

(Horizon) and was acquired by Psychiatric Solutions, Inc. (PSI). PSI's chief executive officer at the time was Joey Jacobs.

In early 2010, PSI considered going private and, thus, no longer being publicly traded. Several members of Horizon's executive-management team met shortly thereafter to discuss the possibility of buying Horizon from PSI. These team members, who called themselves "Project Shamrock," were Mike Saul (the president of Horizon), Barbara Bayma (the chief clinical officer for Horizon), Peter Ulasewicz (a senior vice-president of business development for Horizon), Cory Thomas (Horizon's chief financial officer), Jack DeVaney (a senior vice-president of operations for Horizon), and Tim Palus (also a senior vice-president of operations for Horizon). Saul approached Jacobs to express Project Shamrock's interest in buying Horizon if PSI went private. Jacobs told Saul that "certain things would remain exactly as they were and that PSI, instead of being a publicly traded company, would just be a privately held company."

Contrary to Jacobs's belief, however, PSI ultimately was acquired by Universal Health Services (UHS), a large, publicly-traded company. Project Shamrock then tried to negotiate buying Horizon from UHS. In late 2010, UHS rejected Project Shamrock's proposal and kept Horizon under UHS's ownership umbrella. The members of Project Shamrock remained employed by Horizon after UHS rejected their buy-out offer.

3

## B. ACADIA FORMS SUBSIDIARY AND HIRES HORIZON EMPLOYEES

In May 2011, Saul approached Acadia Healthcare Company[1] "about the possibility of . . . going over to Acadia." Acadia owned "freestanding psychiatric, child and adolescent, residential, chemical dependency treatment" facilities. Saul presented a business plan to Acadia's president, Brent Turner, on May 18, 2011, proposing that Acadia establish a subsidiary to manage mental-health programs for hospitals and other mental-health providers. In his presentation, Saul identified several companies that would be "competition" for the proposed subsidiary, including Horizon, which Saul indicated was "lost in UHS bureaucracy" and would lose customers "due to relationships." Acadia decided to "move forward" with the proposal, and Saul forwarded his resume and the resumes of Ulasewicz, Palus, and Bayma to Turner as a "proposed management team." Saul also told Turner that they "would go hard" after John Piechocki, a member of Ulasewicz's sales team, based on his successful sales record at Horizon. Indeed, Ulasewicz and Saul began to recruit Piechocki to work for Acadia shortly after Acadia approved Saul's proposal.

In June 2011, Saul, Ulasewicz, Palus, and Bayma met to discuss their anticipated move to Acadia and "their plans for [the planned Acadia subsidiary]."[2]

---

[1]At some point after UHS bought PSI, Jacobs became the chief executive officer of Acadia.

[2]Horizon reimbursed Palus, Ulasewicz, and Bayma for their travel expenses related to these meetings with Saul.

In August and September 2011, Saul, Palus, Bayma, Piechocki, and Ulasewicz resigned from Horizon. Each began working for Psychiatric Resource Partners (PRP), which was a recently formed subsidiary of Acadia borne from Saul's May 2011 presentation. Saul began as the president of PRP. Piechocki told DeVaney, who stayed at Horizon,[3] that PRP would "directly compete" with Horizon.

### C. HORIZON INVESTIGATES

Based on these close-in-time resignations, Horizon conducted a forensic investigation of its computer system and discovered that all except Piechocki "had conferred with one another in reaching their individual decisions to leave, and in making preparations to leave," including discussing strategy regarding their move to Acadia, planning the exact timing of their resignations, and noting when their employment benefits with Acadia would begin. Indeed, shortly before Saul's presentation to Acadia, Ulasewicz e-mailed Saul and told him that several of their possible new clients would come "out of Horizon's hide," their departures would leave Horizon "dead," their business strategy at Acadia should be "hurting Horizon early and often," and "the real Horizon—Jacobs, Saul, Ulasewicz, Bayma, Palus, Piechocki"—would "need to gut punch [Horizon]" as they left.

It is undisputed that Saul, Palus, Ulasewicz, Bayma, and Piechocki (collectively, the individual defendants) accessed their work files and made

---

[3]DeVaney eventually became the president of Horizon.

copies of several Horizon documents before they left to work for PRP. In particular, Saul bought an external hard drive for his work computer in late 2010 and placed "a massive, massive amount" of Horizon documents on it such as policies and procedures, "non-standard" contract language, financial models, monthly account listings, sales presentations, orientation materials, and legal files. Basically, Saul copied onto his external hard drive "everything that was non-financial on [Horizon's] server."

Additionally, during a routine human-resources audit, it was discovered that Saul, Bayma, Palus, and Ulasewicz had signed employment agreements while employed at Horizon, mandating confidentiality and restricting solicitation and competition (collectively, the restrictive covenants). The agreements specifically mentioned the positions each had held at the time the agreements were signed, which were not the same positions each had held at the time of their resignations. The covenants not to compete barred the employees from seeking employment in or independently establishing "a psychiatric contract management company that is in direct competition with [Horizon]." They were further prohibited from soliciting "any employee of [Horizon]." The confidentiality covenants barred the employees from disclosing or using Horizon's trade secrets, confidential information, or proprietary information. Although the employees signed the agreements between 1997 and 2005, the agreements applied "for a period of one (1) year" after their respective employments with Horizon ended.

In September 2011, shortly after the individual defendants left their jobs with Horizon, Horizon notified Bayma, Jacobs, Palus, Piechocki, Saul, and Ulasewicz that their resignations and subsequent employments with Acadia were in violation of their employment agreements and the restrictive covenants entered into "at the inception of [their] employment" and of their common-law duties of good faith and loyalty.[4] Horizon demanded that they end their employment with Acadia and return all documents to Horizon.

## D. PRP'S SALES EFFORTS

Piechocki, using a list of Horizon sales leads he had copied before resigning, was able to secure a consulting contract for PRP with Southwest Regional Medical Center, which was an active Horizon lead noted on its list of sales leads. Although Piechocki marked some of the leads on the list "DEAD" before he resigned from Horizon, those leads were added to PRP's "master contact list" after Piechocki joined Acadia. In January 2012, Piechocki ultimately signed Westlake Regional Hospital (Westlake) to a contract with PRP over "direct competition" from Horizon. Piechocki used Horizon's financial models to "crunch[] numbers" to win the Westlake contract. Additionally, PRP agreed to pay Westlake $150,000 to upgrade its facility, which was not a concession Horizon had ever made before in its management contracts.

---

[4]Piechocki did not sign an employment agreement but, like all the other individual defendants, he acknowledged when he was initially hired that he had reviewed Horizon's employee handbook, which restricted any use of Horizon's confidential information and prohibited direct competition with Horizon.

7

After joining PRP, Ulasewicz set up a meeting with Cottage Hospital, which was a potential client he had met with while employed by Horizon. Ulasewicz previously had learned while still employed by Horizon that Cottage Hospital's impediment to using contract-management services such as those offered by Horizon and PRP possibly would be removed; however, Ulasewicz did not share this information with anyone at Horizon. PRP also began pursuing several of Horizon's existing clients after the individual defendants left Horizon.

### E.  HORIZON FILES SUIT

In October 2011, Horizon filed suit against the individual defendants for breach of fiduciary duty; misappropriation of trade secrets; conversion; accessing proprietary information in violation of the Harmful Access by Computer Act; appropriating proprietary information in violation of the Theft Liability Act, i.e., theft of trade secrets; tortious interference with existing contracts; tortious interference with prospective business relationships; and conspiracy. Against Saul, Palus, Ulasewicz, and Bayma, Horizon additionally raised claims for breach of the restrictive covenants not to compete, fraud, and breach of contract. Horizon alleged Acadia and PRP were liable for all of these acts and omissions either because they were directly involved or under the doctrines of ratification and vicarious liability. Horizon alleged as a separate claim that Acadia and PRP "aided and abetted and provided substantial assistance" to the individual defendants "in breaching their fiduciary duties." Horizon sought exemplary

8

damages, attorneys' fees, the imposition of a constructive trust, compensation forfeiture, and injunctive relief.

### F.  PRETRIAL PROCEDURE

Horizon filed a traditional motion for partial summary judgment, mainly seeking a determination that the employment agreements were valid and enforceable under Texas law; that Saul, Palus, Ulasewicz, and Bayma had breached the restrictive covenants; and that Saul and Ulasewicz had breached the nonsolicitation provisions.  *See* Tex. R. Civ. P. 166a(c).  Acadia, PRP, and the individual defendants (collectively, the Acadia defendants) also moved for summary judgment, under both traditional and no-evidence standards, based on the absence of any genuine issues of material fact on each claim raised by Horizon and because the employment agreements were unenforceable as a matter of law.  *See* Tex. R. Civ. P. 166a(c), (i).

The trial court granted Horizon a partial summary judgment and concluded that "the noncompetition agreements entered into by Horizon with . . . Saul, Palus, Ulasewicz, and Bayma were valid and enforceable covenants not to compete under Texas law at the time of their respective terminations of Horizon employment, without modification."  *See* Tex. Bus. & Com. Code Ann. § 15.51(c) (West 2011) (directing trial court to modify unreasonable limitations in otherwise enforceable covenant).  The trial court denied the Acadia defendants' motion for summary judgment.

Horizon also sought the imposition of sanctions against the Acadia defendants for failure to comply with the trial court's discovery order. *See* Tex. R. Civ. P. 215.2(b). The trial court granted the motion but ordered only Saul to pay Horizon $41,740.80 for his "failure to timely produce all relevant documents and tangible things, and . . . refusal to cooperate with his discovery obligations." *See* Tex. R. Civ. P. 215.2(b)(2), 215.3. The trial court specifically saved for trial the issue of whether a spoliation instruction should be given to the jury.

## G.  TRIAL PROCEDURE

After a lengthy trial, the Acadia defendants orally moved for an instructed verdict on all of Horizon's claims and on Horizon's request for attorneys' fees because Horizon's evidence regarding attorneys' fees did not "apportion[] the fees between the causes of action on which attorney's fees are recoverable" or delineate what factors were considered to establish reasonableness. *See* Tex. R. Civ. P. 268. The trial court denied the motion. At the charge conference, the trial court determined that a spoliation instruction allowing the jury to draw an adverse inference against Saul based on his discovery abuse would be included in the charge.

On December 21, 2012, the jury rendered the following unanimous verdicts on Horizon's claims:

● Breach of covenants not to compete: Saul, Palus, Ulasewicz, and Bayma "continuously and persistently" breached the terms of their covenants not to compete.

10

● Breach of nonsolicitaiton covenants: Saul and Ulasewicz breached the terms of their covenants not to solicit.

● Breach of fiduciary duties: The individual defendants, while acting within the scope of their employment with Acadia and PRP, failed to comply with their fiduciary duties to Horizon. Acadia and PRP ratified this conduct and will earn future profits as a result.[5]

● Intentional interference with noncompetition covenants: The individual defendants, while acting in the scope of their employment with Acadia and PRP, intentionally interfered with the noncompetition covenants. Acadia and PRP ratified this conduct.

● Misappropiration of trade secrets: The individual defendants, while acting in the scope of their employment with Acadia and PRP, misappropriated Horizon's trade secrets. Acadia and PRP ratified this conduct and will earn future profits as a result.

● Conversion: The individual defendants, while acting in the scope of their employment with Acadia and PRP, converted Horizon's proprietary information. Acadia and PRP ratified this conduct and will earn future profits as a result.

● Theft of trade secrets or property: The individual defendants intentionally committed theft of Horizon's property and trade secrets, which were worth at least $20,000. Acadia and PRP ratified this conduct and will earn future profits as a result.

● Harmful computer access: The individual defendants, while acting in the scope of their employment with Acadia and PRP, knowingly accessed Horizon's computers, computer network, or computer system without Horizon's consent and with the intent to harm Horizon. Acadia and PRP ratified this conduct.

● Fraud: Saul, Palus, Ulasewicz, and Bayma committed fraud and fraud by nondisclosure by submitting expense reports for trips taken in June 2011. Acadia and PRP did not benefit from this fraud or ratify it.

---

[5]The jury found, however, that Acadia did not ratify any breach of fiduciary duty by Saul, Palus, Ulasewicz, or Bayma when they sought reimbursement for their June 2011 travel expenses.

11

● Conspiracy: The Acadia defendants participated in a conspiracy that damaged Horizon.

● Aiding and abetting: Acadia and PRP intentionally aided and abetted the individual defendants in breaching some of their fiduciary duties, intentionally interfering with the noncompetition covenants, misappropriating trade secrets, and converting Horizon's proprietary information. Only PRP aided and abetted the theft of Horizon's property or trade secrets and the harmful computer access.

● Malice: The damage sustained by Horizon as a result of the individual defendants' breach of fiduciary duties, intentional interference with the noncompetition covenants, misappropriation of trade secrets, conversion of Horizon's proprietary information, and theft was attributable to the malice of the individual defendants, Acadia, and PRP. The individual defendants, without Horizon's consent, intentionally solicited, accepted, or agreed to accept any benefit from another person on the agreement that the benefit would influence his or her conduct in relation to Horizon's affairs.

The jury awarded Horizon $898,000 in future lost profits from the Westlake contract based on Saul's, Palus's, Ulasewicz's, and Bayma's failures to comply with their covenants not to compete and $3,300,000 in future lost profits based on Saul's and Ulasewicz's failures to comply with their covenants not to solicit. The jury found that Horizon suffered no past lost profits based on these failures to comply. Regarding Horizon's claims for breach of fiduciary duty, intentional interference with the employment agreements, misappropriation of Horizon's trade secrets, conversion of proprietary information, intentional theft of trade secrets, knowing access of Horizon's computer system, and fraud, the jury awarded Horizon $6,003,049.24:

12

● $898,000 in future lost profits from the Westlake contract and $3.3 million in future lost profits from Piechocki's sales production.[6]

● $50,000 as the fair market value of the property or trade secrets, which were the subject of Horizon's claim for theft of property or trade secrets.[7]

● $5,049.24 in expenses charged to Horizon by Ulasewicz, Palus, and Bayma that were not associated with Horizon's business.[8]

● $1.75 million in exemplary damages.

The jury also awarded Horizon $900,000 in attorneys' fees for representation costs incurred through the conclusion of trial. The jury declined to award any appellate attorneys' fees.

## H. POST-TRIAL PROCEDURE

Saul, Palus, Ulasewicz, and Bayma filed a motion to reconsider the partial summary judgment granted in favor of Horizon, and Saul sought reconsideration of the pretrial sanctions order. Acadia and PRP filed a motion to disregard the jury's findings and an alternative motion for judgment notwithstanding the verdict based on legally insufficient supporting evidence. *See* Tex. R. Civ. P. 301. The individual defendants also filed a motion to disregard the jury's findings. *See id.*

---

[6]As they did regarding the individual defendants' failure to comply with the restrictive covenants, the jury found that Horizon suffered no past lost profits from the Westlake contract or Piechocki's sales production.

[7]The jury found that the trade secrets that were the subject of Horizon's claim for misappropriation of trade secrets had no value.

[8]The jury found that Saul charged no expenses to Horizon that were unassociated with Horizon business.

13

The individual defendants adopted the "reasons . . . set forth" in Acadia and PRP's motion to disregard and alternative motion for judgment notwithstanding the verdict. Similarly, Acadia and PRP adopted the individual defendants' motion to disregard the jury's findings and the brief in support.[9] Horizon filed an "omnibus" response to the Acadia defendants' post-trial motions.

Horizon filed a motion for entry of judgment on the verdict and a motion for judgment notwithstanding the verdict regarding the jury's finding on appellate attorneys' fees. *See* Tex. R. Civ. P. 301, 305. The individual defendants responded to Horizon's motion for entry of judgment, and Acadia and PRP incorporated the individual defendants' arguments in their response to Horizon's motion. Horizon filed an "omnibus" reply in support of its motion.

The trial court granted in part and denied in part Horizon's motion, awarding Horizon most of the damages awarded by the jury. The trial court denied the Acadia defendants' motion to disregard the jury's findings, their motion to reconsider the partial summary judgment granted in favor of Horizon, and Saul's motion to reconsider the sanctions. The trial court entered final judgment on July 1, 2013.[10] The final judgment awarded Horizon the full amount

---

[9]Because of this adoption language, we will refer collectively to the two motions to disregard as the Acadia defendants' motion to disregard.

[10]The trial judge who denied the post-trial motions and entered final judgment was not the trial judge who presided over the trial. The trial judge who presided over the trial retired at the end of 2012 shortly after the conclusion of the trial at issue.

14

of damages as found by the jury and entered $41,740 in sanctions against Saul based on the pretrial discovery-abuse ruling. The trial court, however, reduced Horizon's trial attorneys' fees from $900,000 to $769,432, disregarded the jury's zero award of appellate attorneys' fees, and awarded Horizon $97,500 for appellate attorneys' fees.

## I. POST-JUDGMENT PROCEEDINGS

Horizon requested findings of fact and conclusions of law regarding, among other issues, the attorneys' fees awards in the judgment. *See* Tex. R. Civ. P. 296. The Acadia defendants filed a motion to modify, correct, or reform the judgment to "resolve [an] inconsistency in the final judgment . . . [and] award actual past and future damages of $4,203,049.24." *See* Tex. R. Civ. P. 316, 329b. They also filed a motion for new trial, arguing that the jury's findings were supported by factually insufficient evidence.[11] *See* Tex. R. Civ. P. 329b.

On August 8, 2013, the trial court entered findings of fact and conclusions of law, clarifying that Horizon's submitted evidence on attorneys' fees "segregated 25% of its total fees . . . and identified this 25% as fees that were not incurred in connection with a claim for which fees may be awarded." Therefore, the trial court "discounted" the requested attorneys' fees "by 25%." The motion for new trial and the motion to modify, correct, or reform the judgment were

---

[11]The vast majority of their argument focused on the factual insufficiency of the evidence to support the jury's lost-profit findings.

15

overruled by operation of law. *See* Tex. R. Civ. P. 329b(c). All parties filed notices of appeal from the trial court's judgment. *See* Tex. R. App. P. 25.1(c).

The Acadia defendants raise seven issues in their appeal challenging (1) the trial court's partial summary judgment and (2) the jury's findings and damages awards, mainly on the basis of insufficient evidentiary support. Horizon raises three issues in its appeal and argues that the trial court erred by reducing its attorneys' fees awards by 25% based on the admitted evidence establishing the full amount requested as a matter of law.

## II.  DISCUSSION

### A.  INSUFFICIENT EVIDENCE TO SUPPORT LOST-PROFITS FINDINGS

In their third issue, the Acadia defendants argue that the evidence is legally insufficient to support the jury's award of $4,198,000 for future lost-profits damages. The majority of the Acadia defendants' post-trial, post-judgment, and appellate arguments focused on this issue, but their appellate brief contains an accurate summary statement of their contention regarding lost-profits damages: "Texas law does not authorize a business to recover awards of significant damages for alleged future lost profits, when that business has lost no contracts or customers, and its only evidence of damages consists of statistics generated by an expert witness." For the following reasons, we sustain issue three.

### 1.  Preservation

The Acadia defendants assert that the opinion by Horizon's expert, Jeff D. Balcombe, relating to lost profits was unreliable, speculative, and conclusory;

16

thus, it was no evidence of lost profits suffered by Horizon.[12]  The Acadia defendants are attacking Balcombe's methodology based on the lack of foundational data and are asserting that the opinion, therefore, was unreliable and inadmissible based on analytical gaps in the evaluation leading to his opinion.[13]  *See* Tex. R. Evid. 702, 705(c).

A party complaining about the reliability of expert testimony must object to the evidence before trial or when the evidence is offered to preserve a complaint on appeal that the evidence is unreliable.[14]  *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 409 (Tex.), *cert. denied*, 525 U.S. 1017 (1998); *Faust v. BNSF Ry. Co.*, 337 S.W.3d 325, 332–33 (Tex. App.—Fort Worth 2011, pet. denied).  If

---

[12]Because the jury found that Horizon suffered no damages for past lost profits, our references in the remainder of this opinion to "lost profits" or "lost-profit damages" refer only to future lost profits.

[13]Horizon asserts that the Acadia defendants do not attack Balcombe's methodology but only attack the reliability of his opinion.  A lack of reliability is necessarily an attack on an expert's methodology based on some sort of analytical gap.  *See Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 835–38 (Tex. 2014); *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 235 (Tex. 2010).  Thus, these arguments, at least in this case, are two sides of the same coin—an opinion is unreliable and, thus, without evidentiary value if there is a flaw in the expert's methodology.  *See, e.g.*, *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997) ("[A]n expert's testimony is unreliable even when the underlying data are sound if the expert draws conclusions from that data based on flawed methodology."), *cert. denied*, 523 U.S. 1119 (1998).

[14]No objection is required to argue on appeal that, on the face of the record, the testimony is conclusory and speculative and therefore lacks probative value.  *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232–33 (Tex. 2004); *see* Tex. R. Evid. 401.

the trial court overrules an objection to expert testimony, the opposing party then may complain on appeal that the evidence was legally insufficient to support the jury's finding because the expert evidence was unreliable and, thus, constituted no evidence. *Faust*, 337 S.W.3d at 332–33. The Acadia defendants objected to Balcombe's testimony on the ground that his opinion was based on insufficient facts and later specified that Balcombe's opinion was impermissibly based on the unsupported assumption that Westlake was a Horizon lead. The trial court overruled the Acadia defendants' objections and allowed Balcombe to testify regarding Horizon's future lost profits. Additionally, the Acadia defendants argued in their motion to disregard the jury's findings that the evidence of lost profits was legally insufficient because Balcombe's opinion suffered from "fatal infirmities: no alternate causes were considered or ruled out by the damages expert, an analytical gap exists between the alleged wrongful conduct and the damages claimed, and the expert failed to prove that the profits were net profits after all business expenses were considered." The Acadia defendants preserved their argument that Balcombe's testimony was unreliable based on an analytical gap in his methodology and, therefore, was no evidence of lost-profit damages. *See, e.g.*, *City of Dallas v. Redbird Dev. Corp.,* 143 S.W.3d 375, 385 (Tex. App.—Dallas 2004, no pet.) (recognizing distinction in preservation requirements between attacks to expert's methodology and legal-sufficiency complaint).

## 2. Standard of Review

In a legal-sufficiency review, we determine whether more than a scintilla of evidence supports the jury's finding by considering evidence favorable to the finding if a reasonable fact-finder could and disregarding evidence contrary to the finding unless a reasonable fact-finder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996).

Lost profits must be proven with reasonable certainty, and whether lost-profits evidence is reasonably certain is a fact-intensive inquiry. *Phillips v. Carlton Energy Grp., LLC*, 58 Tex. Sup. Ct. J. 803, 2015 WL 2148951, at *9 (May 8, 2015); *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992); *Fraud-Tech, Inc. v. Choicepoint, Inc.*, 102 S.W.3d 366, 381 (Tex. App.—Fort Worth 2003, pet. denied). We are to focus on the experience of the persons involved in the enterprise, the nature of the business activity, the relevant market, the nature of the client base, the sales force, the marketing plan, and the company's track record of sales. *Carter v. Steverson & Co.*, 106 S.W.3d 161, 166 (Tex. App.—Houston [1st Dist.] 2003, pet. denied); *Fraud-Tech*, 102 S.W.3d at 381. The amount of loss need not be subject to exact calculation but need only be shown by competent evidence based on objective facts, figures, or data from which the amount may be ascertained with reasonable certainty. *Hunter Bldgs. & Mfg., L.P. v. MBI Global, L.L.C.*, 436 S.W.3d 9, 17–18 (Tex. App.—Houston [14th Dist.] 2014, pet. filed). At a minimum, however, "opinions or

19

estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained." *Heine*, 835 S.W.2d at 84. A bare assertion that contracts were lost does not show lost profits with reasonable certainty. *Id.* at 85. "The law is wisely skeptical of claims of lost profits from untested ventures or in unpredictable circumstances, which in reality are little more than wishful thinking." *Phillips*, 2015 WL 2148951, at *10.

As the Texas Supreme Court has instructed, we need not distinguish between Horizon's different theories of recovery because its lost-profits damages were recoverable under several of the theories. *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 876 n.3 (Tex. 2010). Indeed, the Acadia defendants do not so parse their argument.[15]

### 3. Application

As previously stated, the jury based its lost-profit awards on two measures of recovery: (1) lost profits from the Westlake contract that Horizon, in reasonable probability, would sustain in the future and (2) lost profits from Piechocki's production that Horizon, in reasonable probability, would sustain in the future. For the first measure, the jury uniformly awarded $898,000 and for the second measure, the jury awarded $3,300,000. The first measure was tied to

---

[15]In their reply, the Acadia defendants argue that the evidence was insufficient to support the award of future lost profits "with respect to each of the tort liability findings." But the Acadia defendants then state that they will "stand on their arguments in their opening brief concerning these redundant tort theories." The Acadia defendants did not include a claim-by-claim analysis of the sufficiency of the evidence to show future lost profits in their opening brief.

Saul's, Bayma's, Ulasewicz's, and Palus's failure to comply with the noncompetition covenants, breaches of fiduciary duties, intentional interference with the employment agreements, misappropriation of trade secrets, conversion of proprietary information, theft of trade secrets, knowing access of Horizon's computer system, and fraud. The second measure was tied to these same claims (with the exception of breach of the covenants not to compete) and Saul's and Ulasewicz's breaches of their covenants not to solicit. Balcombe testified as to both measures of lost-profit damages.

Balcombe testified as to the "lost production" damages Horizon suffered as a result of the individual defendants' wrongful actions. In doing so, he attempted to determine what would have happened but for the wrongful actions—as opposed to what actually happened[16]—by considering (1) how long Piechocki would have remained an employee of Horizon but for the alleged wrongful conduct, (2) how many contracts Piechocki would have sold "but for being an employee of Horizon," and (3) what the average profit for each of those contracts would have been had he remained with Horizon.

To determine the first consideration, Balcombe analyzed the average amount of time Horizon retained its higher-level employees and "conservatively elected to assume" that Piechocki would have stayed at Horizon two or four more years but for the alleged wrongful conduct. The four-year tenure was assumed

---

[16]Indeed, Balcombe admitted that his analysis did not account for any contracts that Horizon actually lost to PRP.

because Piechocki presumably would have been promoted after two years and "senior vice presidents stayed longer." After reviewing e-mails and "deposition testimony," Balcombe concluded that Piechocki "sold more contracts, closed more deals"—50% more than other Horizon salespeople. Thus, Balcombe opined regarding the second consideration that Piechocki would have sold six contracts in each year he stayed, up to four years, but for the wrongful conduct because other Horizon salespeople sold four contracts per year. He affirmed that he included reductions for "normal business losses that would have occurred." Balcombe's third consideration involved a compilation of "data over the period from 2001 through 2011 or '12 regarding the profit per contract . . . to see if there were trends and how to use the data that [was] reliable in [his] calculation." He concluded that $247,000 per year for each contract was "a conservative and reliable figure for a mature contract price." In arriving at this number, Balcombe considered the Westlake contract with PRP and its profit margin of $247,000. These three considerations allowed Balcombe to estimate the amount of Horizon's lost profits at years five ($2,237,000), ten ($3,249,000), and fifteen ($3,378,000) following Piechocki's resignation, assuming an 80% rate of contract retention by Horizon. Balcombe testified that Horizon's contracts were retained for seven years on average.

Balcombe also testified as to the lost profits attributable to the Westlake contract. He reviewed PRP's contract with Westlake "along with other financial documents about that contract." He concluded that the "lost profit or cumulative

22

economic damages" arising from the Westlake contract was $668,220 after five years, $871,500 after ten years, and $898,200 after fifteen years. Balcombe knew that Westlake was not a customer of Horizon but believed Westlake was a lead of Horizon's after the individual defendants left Horizon. In fact, he admitted that his assumption that Westlake was a Horizon lead "might be guessing."

Balcombe's calculations, estimates, "statistical analysis," and "work papers" supporting his conclusions were not admitted into evidence and were merely demonstrative aids. Because this information was not admitted into evidence, some of Balcombe's explanations for his conclusions are difficult to decipher on appeal. For example, Balcombe explained how he calculated the per-year profit of a representative contract by referring to the demonstrative aid he prepared:

> The top part of this calculation represents the but-for incremental profit calculations, the middle part calculated the actual incremental profit calculations, and then down here is where I'm taking the difference between the two what has happened, what would happen versus what could have happened, and calculating the difference is down in this area.

An expert's opinion is not reliable if "there is simply too great an analytical gap between the data and the opinion proffered." *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998). Further, an expert's opinion is not reliable if the foundational data is unreliable or if the expert draws conclusions from sound data based on flawed methodology. *Havner*, 953 S.W.2d at 714. "In sum, case law shows expert testimony on lost profits

23

damages cannot be reliable, and therefore is not admissible, if the expert bases his opinion and calculations on nothing more than assumptions, hearsay, speculation, and his credentials." Jeff Patterson & Giovanna Tarantino, *Is the Bar Really Lower for Nonscientific Expert Testimony?*, 33 The Advoc. (Tex.) 65, 67 (2005). *See generally* Robert M. Lloyd, *The Reasonable Certainty Requirement in Lost Profits Litigation: What it Really Means*, 12 Transactions: Tenn. J. Bus. L. 11, 17–28 (2010) (collecting cases and discussing factors courts consider in determining reasonable certainty, including the court's confidence that the estimate is accurate).

We conclude that Balcombe's opinion was too speculative based on an analytical gap between the data and his opinion; thus, it was no evidence of lost profits suffered by Horizon. The calculations and estimates Balcombe relied on in reaching his lost-profits conclusion were based on nothing more than speculation that (1) Piechocki, an at-will employee, would have stayed employed by Horizon, been offered a senior vice-president position, and accepted the position;[17] (2) Horizon would have won the Westlake contract;[18] and

---

[17]DeVaney testified that he would only have given Piechocki an "opportunity" to interview for Ulasewicz's position on either an interim or permanent basis. Piechocki testified that DeVaney stated he was going to "take his time" in filling Ulasewicz's position and would "oversee the sales department" himself in the interim.

[18]Indeed, Piechocki testified that as part of PRP's contract negotiations with Westlake, PRP paid Westlake $150,000 "toward the construction costs of the build out, just to update the facility, the unit, to current standards." Horizon had never included such a term in its contracts.

24

(3) hypothetical contracts signed by Piechocki during his hypothetical tenure with Horizon would have been profitable until 2026[19]—fifteen years after Piechocki's 2011 resignation from Horizon even though the average contract-retention period was seven years. Horizon produced no evidence to support a fifteen-year retention period.[20] Balcombe's testimony confirms the supreme court's shorthand method of determining the evidentiary value of an expert's opinion on lost profits: "Merely laying out the [expert's] calculation [of lost profits], with its sweeping assumptions, demonstrates how completely conjectural it is." *Phillips*, 2015 WL 2148951, at *11. Balcombe's testimony, which consisted of unsupported factual assumptions and analyses that were not admitted into evidence, was not competent to show with reasonable certainty that Horizon suffered lost profits as a direct result of the individual defendants' actions. *See, e.g.*, *McBeth v. Carpenter*, 565 F.3d 171, 176–77 (5th Cir. 2009) (holding evidence that "later transaction" was profitable no evidence of lost profits

---

[19]Piechocki testified that Westlake was not current on its management payments to PRP at the time of trial.

[20]We decline Horizon's invitation on rehearing to determine the amount of lost-profit damages that are supported by the record and modify the trial court's lost-profit award accordingly. Balcombe's testimony did not establish any amount of lost-profit damages with reasonable certainty; thus, we are unable to award Horizon a lesser amount of lost-profit damages based on Balcombe's speculative testimony. *Cf. ERI Consulting*, 318 S.W.3d at 876–78 (reducing jury's lost-profit award based on legally sufficient and largely undisputed evidence of lost profits and recognizing "uncertainty as to the fact of legal damages is fatal to recovery, but uncertainty as to the amount will not defeat recovery").

25

because later transaction was "markedly different" from transaction plaintiffs alleged was lost due to defendants' actions); *Blase Indus. Corp. v. Anorad Corp.*, 442 F.3d 235, 239 (5th Cir.) (holding employer could not recover damages for lost profits based on at-will employee's "speculative future earnings" because employee "could have left . . . at any point during the year in question"), *cert. denied*, 549 U.S. 817 (2006); *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995) (holding when assumed factual bases underlying expert's opinion are materially different from actual facts and not supported by record evidence, expert opinion has no probative value); *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649–50 (Tex. 1994) (holding evidence that company "expected to make a profit" legally insufficient because expectation based on "pure speculation" and record did not support conclusion that amount of lost profits resulted from defendant's actions); *AZZ Inc. v. Morgan*, No. 02-14-00097-CV, 2015 WL 1623775, at *8 (Tex. App.—Fort Worth Apr. 9, 2015, no pet.) ("Although the methodology utilized by [AZZ's expert]—after making the above assumptions—to calculate AZZ's future lost profits for three years or five years into the future may be valid, the underlying assumptions themselves, that is, the facts [the expert's] future lost-profits calculations are premised on, are merely speculative."); *Ramco Oil & Gas Ltd. v. Anglo-Dutch (Tenge) L.L.C.*, 207 S.W.3d 801, 824–25 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (op. on reh'g) (concluding evidence of lost profits legally insufficient because "Plaintiffs' proof of lost profits is largely speculative, dependent on uncertain and changing market

26

conditions, and based on risky business opportunities and the success of an unproven enterprise"); *Atlas Copco Tools, Inc. v. Air Power Tool & Hoist, Inc.*, 131 S.W.3d 203, 209 (Tex. App.—Fort Worth 2004, pet. denied) (holding manufacturer's evidence of lost profits insufficient because manufacturer included customers not part of distributor's customer base and because numbers for six-year period were based on "one record year"); *SBC Operations, Inc. v. Business Equation, Inc.*, 75 S.W.3d 462, 468–69 (Tex. App.—San Antonio 2001, pet. denied) (concluding evidence of lost profits insufficient because based on "assumptions" of increased business that "had no basis in fact"); *Aquila Sw. Pipeline, Inc. v. Harmony Exploration, Inc.*, 48 S.W.3d 225, 245–46 (Tex. App.—San Antonio 2001, pet. denied) (although expert used standard methodology to determine lost profits, evidence of lost profits insufficient because underlying facts were "merely speculative"); *accord Saks Fifth Ave., Inc. v. James, Ltd.*, 630 S.E.2d 304, 307–08, 311–12 (Va. 2006) (holding similar expert evidence of future lost profits attributable to departure of at-will employee insufficient because calculation "focused solely on a 'but-for' model of what [employer's] profits would have been had [employee] remained employed there"). Balcombe's testimony was the only evidence of Horizon's damages for lost profits; thus, the evidence was legally insufficient to support these damage findings.

Because we have concluded the evidence was legally insufficient to support the jury's lost-profits findings under any liability theory, we need not address the Acadia defendants' issues attacking the sufficiency of the evidence

27

supporting those liability findings or the manner in which those liability theories were submitted in the jury charge.[21] It is also not necessary for us to address the Acadia defendants' assertion that the trial court erred to conclude as a matter of law that the restrictive covenants were enforceable without modification. Thus, we do not address issue one, issue two, or portions of issue four raised by the Acadia defendants.

## B. DENIAL OF MOTION TO DISREGARD JURY'S FINDINGS AND MOTION FOR NEW TRIAL[22]

### 1. Insufficient Evidence to Support Jury's Liability Findings

In part of issue four, the Acadia defendants assert that the evidence was legally insufficient to support the jury's findings that (1) the individual defendants breached their fiduciary duties; (2) the individual defendants misappropriated Horizon's trade secrets; (3) the individual defendants converted Horizon's

---

[21]We recognize that typically a finding that the evidence was insufficient to support an award of actual damages results in an automatic reversal of the awards of exemplary damages and attorneys' fees based on those unrecoverable actual damages. *See Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 201 (Tex. 2004); *Twin City Fire Ins. Co. v. Davis*, 904 S.W.2d 663, 665 (Tex. 1995). We address exemplary damages and attorneys' fees later in this opinion because there were liability findings upon which Horizon recovered actual damages other than lost-profits damages.

[22]Although the Acadia defendants do not specifically attack the trial court's denial of their motion to disregard the jury's findings and motion for new trial, their legal-sufficiency issues were preserved through these procedural devices; thus, their appellate issue necessarily attacks the trial court's denials as well. *See T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 220–21 (Tex. 1992); *cf. Galaznik v. Galaznik*, 685 S.W.2d 379, 384 (Tex. App.—San Antonio 1984, no writ) ("When the overruling of a motion for judgment notwithstanding the verdict is attacked, the appellate court reviews this as a 'no evidence' point.").

proprietary information; (4) the individual defendants knowingly accessed Horizon's computer system without Horizon's consent and with the intent to harm Horizon; (5) Saul, Palus, Bayma, and Ulasewicz committed fraud and fraud by nondisclosure; (6) the individual defendants intentionally solicited, accepted, or agreed to accept a benefit from another knowing that the benefit would influence his or her conduct in relation to Horizon's business affairs; and (7) the Acadia defendants were liable for civil conspiracy.[23]  Because we have concluded that the evidence of lost profits was legally insufficient, we will review the sufficiency of the evidence of Horizon's theories of liability that would allow for recovery for the trade-secret and business-expenses damages found by the jury—theft of trade secrets, fraud, and fraud by nondisclosure—and that are raised by the Acadia defendants on appeal.

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital

---

[23]Many of the Acadia defendants' sufficiency contentions are summarily briefed such that the entirety of their appellate contention consists of nothing more than the statement of what the jury's finding was with no further argument. Indeed, the Acadia defendants seem to assert that their sufficiency attacks on each theory of liability are nothing more than further support for their issue that the evidence of lost profits was legally insufficient.  To the extent we can divine what their specific appellate assertion is, we will address it.  *See* Tex. R. App. P. 38.9.

fact.  *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999).  Anything more than a scintilla of evidence is legally sufficient to support the finding.  *Cont'l Coffee*, 937 S.W.2d at 450.  More than a scintilla of evidence exists if the evidence, even if circumstantial, furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact.  *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002); *Russell v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993).

### a.  Theft of trade secrets

The Acadia defendants attempt to challenge the jury's findings that the individual defendants intentionally committed theft of Horizon's property or trade secrets.[24]  Their argument seems to be that after answering "yes" that the individual defendants did so steal, misappropriate, and convert Horizon's property or trade secrets, the jury found that the value of the misappropriated trade secrets was zero, the value of the converted proprietary information was zero, but the fair market value of the stolen property or trade secrets was $50,000, which is an insupportable conflict.[25]  Although given time to review the

---

[24]At oral argument, counsel for the Acadia defendants seemed to concede that they were not attacking the jury's damages finding regarding the fair market value of the trade-secret items that the individual defendants stole.

[25]To the extent the Acadia defendants are arguing anything other than this conflict, we will not address it as inadequately briefed.  Even a liberal construction of their one-sentence argument in their appellate brief is insufficient to determine what their contentions or supporting facts and authorities are.  *See* Tex. R. App. P. 38.1(i), 38.9(b).

30

jury verdict for any "inconsistency," the Acadia defendants raised no objection to this alleged conflict in the jury's answers before the jury was discharged. A complaint of conflicting jury findings must be raised before the jury is discharged to preserve any error for our review. *Kitchen v. Frusher*, 181 S.W.3d 467, 473 (Tex. App.—Fort Worth 2005, no pet.) (op. on reh'g); *see also* Tex. R. Civ. P. 295. The Acadia defendants failed to preserve this error, and we overrule this portion of issue four.

### b. Fraud and fraud by nondisclosure

The Acadia defendants next attempt to challenge the jury's findings that Saul, Palus, Ulasewicz, and Bayma committed fraud and fraud by nondisclosure and the jury's attendant damages findings regarding Palus, Ulasewicz, and Bayma. The entirety of their argument focuses on the record facts surrounding these findings:

> [T]he jury found that Saul, Palus, Ulasewicz, and Bayma had committed fraud and fraud by non-disclosure in connection with expense reports for trips on June 8 and June 29, 2011. ([cite to jury charge in the clerk's record]) These are the trips during which the four admit they met to discuss their plans for PRP. The jury awarded damages of $2,601.41 against Palus, $1,398.45 against Ulasewicz, and $1,049.38 against Bayma. ([cite to jury charge in the clerk's record])

Although we are unsure what the Acadia defendants specifically are attacking, if they are challenging the sufficiency of the evidence to support each of these findings, the above-quoted statement is insufficient to appropriately raise such an evidentiary argument. *See, e.g.*, *McCullough v. Scarbrough, Medlin & Assocs.,*

31

*Inc.*, 435 S.W.3d 871, 912 (Tex. App.—Dallas 2014, pet. denied).  We overrule this portion of issue four.

### C. EXEMPLARY DAMAGES

### 1. Sufficiency of the Evidence

The Acadia defendants argue as part of their fifth issue that the evidence was legally insufficient to support the jury's malice finding against the individual defendants because there was no evidence that the individual defendants specifically intended to cause a substantial injury that would support exemplary damages.[26]  The jury was asked in question 21 whether it found "by clear and convincing evidence that the harm to Horizon from [the individual defendants' breach of fiduciary duty, intentional interference with the noncompetition covenants, misappropriation of trade secrets, conversion of proprietary information, theft of trade secrets or property, and knowing access of Horizon's computer system] resulted from malice by Saul, Palus, Ulasewicz, Bayma, or Piechocki."  Similarly, the jury was asked in question 22 whether clear and

---

[26]In their opening brief, the Acadia defendants contended that there was no evidence that they specifically intended that Horizon would suffer any injury different from its economic damages for "lost profits, diminished market value, and a minor amount of expenses."  In other words, they seemed to raise the independent-injury rule as a bar to exemplary damages in this case.  Indeed, Horizon addressed the independent-injury rule in its response brief.  But in their reply, the Acadia defendants assert the independent-injury rule has no application because recovery was not based on breach of contract and contend that "none of the parties have previously argued the economic loss rule in this case."  To the extent the Acadia defendants attempted to raise the independent-injury rule in their opening brief, we will not address it.

convincing evidence showed that the harm to Horizon was a result of Saul's, Palus's, Ulasewicz's, and Bayma's fraud and fraud by nondisclosure in submitting expense reports for reimbursement for the June 2011 meetings.[27] The jury answered "yes" for each named individual defendant in question 21 and question 22. In response to question 23, the jury awarded Horizon $1,750,000 in exemplary damages against the individual defendants: $500,000 against Saul; $500,000 against Ulasewicz; $250,000 against Palus; $250,000 against Bayma; and $250,000 against Piechocki. The jury was not asked specifically to award exemplary damages against either PRP or Acadia.

In their reply brief, the Acadia defendants expound on their legal-insufficiency argument raised in their opening brief:

> [I]nsufficient evidence establishes the defendants engaged in "aggravated" conduct of the type that warrants [exemplary] damages. The defendants were competitive and eager to break into the expanding market for contract-based management services in a unique sector of the health care industry. Their enthusiasm for accessing this market did not come at Horizon's expense, as Horizon agreed the defendants did not lure any of its existing customers away when they formed PRP. Rather, the defendant tapped new leads and customers unknown to Horizon. This very activity—competing by tapping into new market share and utilizing Horizon's forms—was the basis for Horizon's underlying tort claims for misappropriation of trade secrets, fraud, harmful access by computer and civil theft. Horizon did not establish, by clear and convincing evidence, "aggravated" conduct independently or qualitatively different from Horizon's tort claims for lost profits, diminished market value, and a minor amount of expenses.

---

[27]The Acadia defendants do not attack question 22 in their arguments regarding exemplary damages.

The Acadia defendants did not include any record references or citations to legal authorities to support these factual statements and legal precepts.

In any event, exemplary damages may be awarded if Horizon produced clear and convincing evidence that its harm resulted from the individual defendants' fraud or malice. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a)–(b) (West 2015). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 41.001(2) (West 2015). As the jury was charged, malice is "a specific intent by the defendant to cause substantial injury or harm to the claimant." *Id.* § 41.002(7) (West 2015). In their opening brief, the Acadia defendants focus solely on the sufficiency of the evidence to show malice and do not sufficiently address fraud.[28] We will do likewise and will also determine if the exemplary damages are reasonable and proportionate to the actual damages recovered, given that we have concluded the lost-profit award must be vacated. *See id.*

---

[28]Although this basis for exemplary damages alone is sufficient to justify an exemplary-damage award against Saul, Palus, Ulasewicz, and Bayma, *see* Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a); *Alahmad v. Abukhdair*, No. 02-12-00084-CV, 2014 WL 2538740, at *13 (Tex. App.—Fort Worth June 5, 2014, pet. denied) (mem. op. on reh'g), we will address the Acadia defendants' lack-of-malice contention in an abundance of caution. Such caution especially is warranted in this case when the Acadia defendants' counsel candidly admitted during oral argument that he did not know which of the Acadia defendants' issues were dispositive and which issues need not be addressed based on favorable determinations of related issues. Further, the fraud found by the jury to justify exemplary damages did not extend to Piechocki.

§ 41.013(a) (West 2015) (requiring intermediate appellate courts to detail reasons and specific facts in reviewing exemplary-damage awards); *Bunton v. Bentley*, 153 S.W.3d 50, 51 (Tex. 2004) (requiring appellate court to address whether exemplary damages are excessive when compared to actual damages even if not raised on appeal).

In reviewing the legal sufficiency of the evidence to support an actual malice finding, which must be proven by clear and convincing evidence, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that the defendant acted with actual malice. *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 220–21 (Tex. 2005); *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 609, 627 (Tex. 2004). Malice may be shown through direct or circumstantial evidence. *See Soon Phat, L.P. v. Alvarado*, 396 S.W.3d 78, 110 (Tex. App.—Houston [14th Dist.] 2013, pet. denied).

We conclude that the evidence was legally sufficient to support the jury's finding that the individual defendants acted with malice. Each of the individual defendants were highly-placed employees at Horizon. Part of the business plan that Saul presented to Acadia regarding the idea of forming an Acadia subsidiary recognized that Horizon's customers would have to be targeted. Saul cautioned Acadia's president, Turner, that any attempt to "orchestrate a management team 'lift-out'" while the individual defendants were employed by Horizon carried "risk," specifically a "claim [of] tortious interference." One e-mail from Ulasewicz to

35

Saul, which was sent while both were employed by Horizon and three days before Saul made his presentation to Acadia, was particularly damning:

> Here are my thoughts on a 12 – 24 month [strategy] relative to positioning. This time frame is critical to us in terms of success. Based on our preliminary sales plan as presented, we are in fact saying that we are going to take [a] certain number of agreements out of Horizon's hide, both new deals but also terming contracts. . . . I would also recommend you begin to group the contracts we know are coming up over the next two years and place them in maybe three categories from In Play to Unlikely to Switch. . . . We also need to know not only the termination dates but much more importantly any rollover dates, this is critical.
>
> . . . The more members of our senior management we bring over the greater our ability to shape and hone a message to potential clients that is based implicitly and explicitly on our knowledge that [their] Horizon exists in name only. . . . I do advocate we get either Palus or [Piechocki] and . . . we should bring in Bayma. Hurting Horizon early and often is a business [strategy] and a good one. . . .
>
> . . . I cannot think of a bigger body blow relative to impacting future new sales for Horizon than to get Piechocki out of there.
>
> . . . The message to potential clients is Pedigree – we need to convey this is not a startup, this is a logical continuation of the undeniably established Leadership, Experience and Expertise that maintained Horizon in its number one position for the last ten years.
>
> . . . .
>
> . . . [T]ransition timing is very important I believe. We need to gut punch them as we leave, to me that means having all of our ducks in a row so we can move quickly into the market. Let's make sure we talk around timelines before you commit, I know you are anxious to leave but if you wait for the right time, it will be all the sweeter. Business first – success is the best r[e]venge – trust me on this.

Once Acadia decided to proceed with Saul's plan, Saul forwarded Ulasewicz's, Palus's, and Bayma's resumes to Turner. Bayma questioned Saul extensively about the benefits she would receive as an Acadia executive. Bayma further recommended "bring[ing] more technology" to Acadia clients than that provided by Horizon and "integrating clinical policies, systems with the Acadia hospitals." Saul told Turner that Acadia should "go hard" after Piechocki, which would "put a real hurt on the competition." Ulasewicz and Saul discussed how to convince Horizon customers to use PRP's services. Saul requested an external hard drive for his Horizon computer, which Horizon paid for, and downloaded "everything that was non-financial on [Horizon's] server." He instructed his secretary to disable any encryption on the computer and to not re-enable it. Saul also e-mailed many Horizon confidential documents to himself before resigning.

Before leaving Horizon, Saul, Ulasewicz, Bayma, and Palus met away from Horizon offices to discuss their plans for the subsidiary. Palus, Ulasewicz, and Bayma sought and received reimbursement from Horizon for the costs of this trip. Saul cautioned the group to keep their "plans discrete [sic]" and described their planned, orchestrated resignations. In addition, Saul checked out the individual defendants' personnel files in April 2011, shortly before his presentation to Acadia, and kept them until August 15, 2011, shortly before he resigned.

Before resigning to work for PRP, Piechocki e-mailed many Horizon documents to his personal e-mail address, including Horizon's lead list.

37

Piechocki and Ulasewicz later used this list to create a lead list for PRP. Ulasewicz told Saul, Palus, Piechocki, and Bayma that the disclosure of the newly-formed PRP lead list "or any related strategy" would "be viewed as an act of treason against the group." Piechocki later used Horizon's confidential contract form and merely substituted "PRP" everywhere it provided "Horizon." While he was still employed by Horizon, Ulasewicz found out that a potential Horizon client, which previously had been unable to contract with Horizon, had determined it could use Horizon's services. Ulasewicz told no one at Horizon and contacted the company after he joined PRP.

This legally sufficient evidence supports the jury's finding of malice by the individual defendants. *See, e.g.*, *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 883–84 (5th Cir. 2013); *Nova Consulting Grp., Inc. v. Eng'g Consulting Servs., Ltd.*, 290 F. App'x 727, 740–41 (5th Cir. 2008); *Lundy v. Masson*, 260 S.W.3d 482, 496–97 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). We overrule this portion of issue five.

## 2. Constitutional Excessiveness

Although not raised by the Acadia defendants on appeal,[29] we must also address whether the exemplary-damage awards were excessive in light of the

---

[29]The Acadia defendants raised the disproportionality or excessiveness of the exemplary damages in their motion to disregard the jury's findings and supporting brief, to which Horizon responded.

sustainable awards for actual damages and, thus, unconstitutional.[30] *See Bunton*, 153 S.W.3d at 51, 54; *see also Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 308 (Tex. 2006) ("We review not whether the exemplary damage award is exorbitant . . ., but whether it is constitutional."). We have concluded that $55,049.24 of actual damages are recoverable: $50,000 for the fair market value of the trade-secret items that the individual defendants misappropriated and $5,049.24 for the fraudulent reimbursements Palus, Ulasewicz, and Bayma requested from Horizon for their pre-resignation trip to meet about their plans for PRP. The jury awarded a total of $1,750,000 in exemplary damages against the individual defendants: $500,000 each against Saul and Ulasewicz and $250,000 each against Palus, Bayma, and Piechocki.

Although exemplary damages are imposed to punish a defendant, they may not be grossly disproportionate to the gravity of the defendant's conduct. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 426, 123 S. Ct. 1513, 1524 (2003). In determining whether the jury's award is grossly excessive or disproportionate we consider (1) the degree of reprehensibility of the

---

[30]The Acadia defendants also do not assert on appeal, as they did in the trial court in their motion to disregard the jury's findings, that the statutory cap on exemplary damages applies to reduce the jury's exemplary-damage awards as a matter of law. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.008(b) (West 2015). But because the jury specifically found that the individual defendants committed theft of trade secrets as defined in the penal code, the cap would not apply. *See id.* § 41.008(c)(13); Tex. Penal Code Ann. § 31.05 (West 2011); *cf. O'Hare v. Graham*, 455 F. App'x 377, 383 (5th Cir. 2011) (holding because jury made no specific findings regarding exceptions to application of statutory damages cap, cap applied to reduce awarded exemplary damages).

defendant's misconduct, (2) the disparity between the actual or potential harm suffered by the plaintiff and the exemplary-damages award, and (3) the difference between the exemplary damages awarded by the jury and the penalties authorized or imposed in comparable cases. *Id.* at 418, 123 S. Ct. at 1520.

The most important of the three considerations is the degree of reprehensibility of the defendant's conduct. *Id.* at 419, 123 S. Ct. at 1521. Reprehensibility, in turn, considers whether the harm caused was physical as opposed to economic, the tortious conduct evinced a reckless disregard of the health or safety of others, the target of the conduct had financial vulnerability, the conduct involved repeated actions or was an isolated incident, and the harm was the result of intentional malice, trickery, deceit, or mere accident. *Id.* Here, there was no physical injury to Horizon, Horizon did not allege that the individual defendants exhibited reckless disregard for others' health or safety, and Horizon was not financially vulnerable. However, the individual defendants' conduct was repeated and intentional. *See Bennett v. Reynolds*, 315 S.W.3d 867, 874–75 (Tex. 2010) (considering surrounding circumstances beyond the underlying tort in determining reprehensibility). The disparity between the exemplary damages and the compensatory damages after our reduction of Horizon's compensatory damages is a more than thirty-to-one ratio. Finally, the criminal penalties authorized for theft of trade secrets are imprisonment for two to ten years and a

maximum $10,000 fine.  *See* Tex. Penal Code Ann. § 12.34 (West 2011), § 31.05(c).

Few awards that exceed a single-digit ratio will satisfy due process, and the Supreme Court has suggested that a four-to-one ratio perhaps is the limit of what the constitution will allow.  *Campbell*, 538 U.S. at 425, 123 S. Ct. at 1524. The Texas Supreme Court has concluded that a 4.33-to-1 ratio violated due process when only one of the reprehensibility factors was present.  *See Tony Gullo*, 212 S.W.3d at 308–10; *see also Bennett*, 315 S.W.3d at 878–80 (analyzing *Tony Gullo*'s disapproval of 4.33-to-1 ratio and concluding absence of particularly egregious act negated requested upward departure from 4-to-1 ratio). While the individual defendants' conduct may be categorized as repeated and intentional, the degree of its reprehensibility is mitigated by the economic nature of the harm to Horizon, the lack of any reckless disregard for the health or safety of others, and Horizon's financial status.  Finally, the maximum criminal fine for theft of trade secrets is $10,000.  We conclude that the jury's award of exemplary damages, given the lack of legally sufficient evidence of lost profits, was excessive and unconstitutional.

The remedy for excessive punitive damages is to suggest a remittitur, if possible, or remand for a new trial.  *Guevara v. Ferrer*, 247 S.W.3d 662, 670 (Tex. 2007).  We initially ordered a remittitur amount that reflected the exemplary-damages total to be in proportion to the awarded actual damages— the total amount of exemplary damages against the individual defendants added

41

together could not exceed the constitutional ratio to actual damages. On rehearing, Horizon argues that the proportion of actual damages to exemplary damages is measured on a per-defendant basis. The law on this point is far from clear, but we believe Horizon has the more reasoned argument and conclude that the exemplary damages against each individual defendant should be compared to and proportionate to the amount of actual damages awarded by the jury. *See Carlton Energy Grp., LLC v. Phillips*, 369 S.W.3d 433, 459–61 (Tex. App.—Houston [1st Dist.] 2012) (considering exemplary-damage amounts on a per-defendant basis in concluding that ratio of actual damages to exemplary damages was not constitutionally excessive), *aff'd in part & rev'd in part on other grounds*, 2015 WL 2148951; *Huynh v. Phung*, No. 01-04-00267-CV, 2007 WL 495023, at *13–14 (Tex. App.—Houston [1st Dist.] Feb. 16, 2007, no pet.) (mem. op.) (comparing each exemplary-damage award against each defendant in determining ratio to compensatory damages and excessiveness); *cf. Rose v. Doctors Hosp.*, 801 S.W.2d 841, 846 (Tex. 1990) (op. on reh'g) (calculating wrongful-death damages governed by statutory cap on a per-defendant basis); *Seminole Pipeline Co. v. Broad Leaf Partners, Inc.*, 979 S.W.2d 730, 751 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (applying exemplary-damage cap in current section 41.008 on a per-defendant basis); 28 Tex. Jur. 3d *Damages* § 350 (2015) ("Furthermore, the statutory cap [on exemplary damages in section 41.008] is applied on a per-defendant basis, not to the entire award of exemplary damages."). *But see Planned Parenthood of Columbia/Willamette Inc. v. Am.*

*Coalition of Life Activists*, 422 F.3d 949, 963–64 (9th Cir. 2005) ("We shall remit to a sum for each plaintiff that is nine times that plaintiff's compensatory recovery, and we shall allocate that amount of punitive damages among defendants in the same proportion as the jury did in its verdicts."), *cert. denied*, 547 U.S. 1111 (2006); *Cass v. Stephens*, 156 S.W.3d 38, 77 (Tex. App.—El Paso 2004, pets. denied) (op. on remand) ("The jury assessed compensatory damages of $101,300.92 against Frank and $98,780.82 against Frank and Michael jointly and severally. An appropriate amount of punitives against Frank individually is $300,000, and against Frank and Michael jointly and severally is $300,000."), *cert. denied*, 552 U.S. 819 (2007); 4 Andrew L. Grey et al., *Bus. & Com. Litig. Fed. Cts.* § 45.54 (3d ed. 2014) ("When the defendants are members of the same corporate family and the compensatory award is joint and several, it is . . . more appropriate to calculate a single ratio using the full compensatory award as the denominator, as opposed to using the full amount of compensatory damages as the denominator for multiple ratios."). We recognize that some of the cases we cite in support of this holding addressed other statutory caps on damages. But a cap is a cap, and a cap is applied to the total recovery on a per-defendant basis.

Here, we believe four times the $55,049.24 in actual damages awarded—$220,196.96—would render the punitive damages against each individual defendant appropriately proportional to the gravity of their conduct and the actual damages awarded and, thus, constitutional. Therefore, we suggest a remittitur in

43

an amount that would cause $220,196.96 in exemplary damages to be assessed against each individual defendant.[31]  If Horizon files this remittitur with the trial court clerk within thirty days of this opinion and notifies this court of such, we will reform this portion of the trial court's judgment and, as reformed, affirm the exemplary-damage award.  Otherwise, we will reverse portions of the trial court's judgment and remand for a new trial on limited issues.  *See* Tex. R. App. P. 46.3; Tex. R. Civ. P. 315; *see also Bennett v. Reynolds*, No. 03-05-00034-CV, 2010 WL 4670270, at *5 (Tex. App.—Austin Nov. 18, 2010) (mem. op. on remand), *supplemental opinion after remittitur*, 440 S.W.3d 660, 660–61 (Tex. App.—Austin 2011, no pet.).

### 3.  Jury-Charge Error

### a.  Question 23

As part of their fifth issue, the Acadia defendants assert that question 23—inquiring as to the appropriate amount of exemplary damages to be awarded to Horizon—was fatally defective and improperly submitted.[32]  They contend that the broad-form question "impermissibly combined numerous legal theories in a

---

[31]Accordingly, the exemplary-damage awards against Palus, Bayma, and Piechocki would be reduced by $29,803.04, and those against Saul and Ulasewicz would be reduced by $279,803.04.  This would result in a total exemplary-damage award of $1,100,984.80.

[32]We previously concluded that the evidence was legally sufficient to support the jury's findings that the individual defendants acted with malice in response to question 21.  The individual defendants did not attack the sufficiency of the evidence to support the jury's findings regarding fraud in question 22.

44

way that makes it impossible for this Court to determine the basis for the jury's answers."

Horizon argues that the Acadia defendants waived this argument because they did not object to question 23 at trial on the basis that the question failed to segregate between theories of liability. At trial, the Acadia defendants objected to question 23 because "there [was] not a separate question for each Defendant. It is a Casteel problem." Now on appeal, the Acadia defendants argue that each legal theory should have been submitted in a separate question. By referencing "Casteel," the Acadia defendants were necessarily raising the issue that the question erroneously comingled valid and invalid liability theories. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388–89 (Tex. 2000) (op. on reh'g). We disagree with Horizon and conclude that the Acadia defendants sufficiently raised this argument in the trial court. *See, e.g.*, *Tex. Comm'n on Human Rights v. Morrison*, 381 S.W.3d 533, 536 (Tex. 2012); *Kelley & Witherspoon, LLP v. Hooper*, 401 S.W.3d 841, 854 (Tex. App.—Dallas 2013, no pet.).

The jury was asked in question 23 "[w]hat sum of money, if any, if paid now in cash, should be assessed against Saul, Palus, Ulasewicz, Bayma, and Piechocki and awarded to Horizon as exemplary damages, if any, for the conduct found in Question No. 21 [malice by the individual defendants] or Question No. 22 [Saul's, Palus's, Ulasewicz's, and Bayma's fraud]." Broad-form questions are the preferred method of submitting issues to the jury. *See* Tex. R. Civ. P. 277. But a broad-form question cannot be used to "put before the jury issues

45

that have no basis in the law or the evidence." *Romero*, 166 S.W.3d at 215. Here, there was evidence to support the submission of both fraud and malice as a basis for exemplary damages—neither was an invalid theory of recovery. *Cf. Morrison*, 381 S.W.3d at 537 (holding broad-form liability question harmful because included whether employer took adverse employment action against employee because employee's claim she was denied promotion was an invalid theory given that she had not included claim in her EEOC complaint). Because there is a presumption in favor of broad-form submissions and because question 23 did not put an invalid theory before the jury, we conclude that the trial court did not abuse its discretion in submitting both malice and fraud as theories of liability supporting exemplary damages. *See Cimarron Country Prop. Owners Ass'n v. Keen*, 117 S.W.3d 509, 511 (Tex. App.—Beaumont 2003, no pet.).

### b. Question 24

The Acadia defendants also attack the question that asked whether Horizon's harm was attributable to any malice by Acadia or PRP—question 24— because it did not allow this court to specify "what conduct the jury determined was the basis for a finding of malice" and because the question did "not allow the Court to determine that the same twelve jurors found the malice resulted from the conduct or ratification of the same individual defendants." At trial, the Acadia defendants objected to question 24 because it (1) improperly allowed a ratification or approval finding through a vice-principal with no evidence that any individual defendant was a corporate officer and (2) failed to "differentiate

46

between the dates of occurrence for the various causes of action." The Acadia defendants' appellate arguments are substantively different from the objections raised to the trial court, and they failed to submit a substantially correct question resolving their appellate arguments. Thus, the Acadia defendants' arguments directed to question 24 were not preserved for our review.[33] *See* Tex. R. Civ. P. 272, 274, 278.

We overrule these portions of issue five.

### 3. Joint and Several Liability

The Acadia defendants argue that the trial court's judgment awarding exemplary damages against Acadia and PRP jointly and severally was in error.[34] In awarding exemplary damages, the trial court provided that each award was "jointly and severally from" each individual defendant, Acadia, and PRP. The

---

[33]Because any defective submission of question 24 has not been preserved, we need not address the Acadia defendants' arguments regarding "course and scope and ratification," which are contingent on the defective submission of question 24.

[34]Horizon argues that the Acadia defendants failed to raise this issue in their opening brief, thereby waiving it. However, the Acadia defendants argued that the trial court's erroneous submission of the exemplary-damages questions "was compounded because it also awarded exemplary damages against Acadia and PRP under a vicarious liability theory, which is never proper under Texas law." They further stated that "question 24 does not support a judgment against Acadia and PRP for exemplary damages." We conclude these arguments fairly raised the issue for our review and reject Horizon's contention that the Acadia defendants' failure to specifically cite section 41.006 renders their appellate argument waived as inadequately briefed. *See* Tex. R. App. P. 38.1(f); *see, e.g.*, *Perry v. Cohen*, 272 S.W.3d 585, 587–88 (Tex. 2008); *Crawford v. XTO Energy, Inc.*, 455 S.W.3d 245, 247–48 (Tex. App.—Amarillo 2015, pet. filed).

47

individual defendants specifically argued to the trial court in their response to Horizon's motion for entry of judgment that "Acadia and PRP cannot be jointly and severally liable for the exemplary damages assessed against Saul, Palus, Ulasewicz, Bayma, and Piechocki" and that joint-and-several liability was improper based on the absence of a specific, exemplary-damage award against Acadia or PRP. Acadia and PRP seemed to adopt "all" of the individual defendants' arguments raised in response to Horizon's motion for entry of judgment. Indeed, Horizon filed an "omnibus" reply in support of its motion for entry of judgment and specifically argued that Acadia and PRP were jointly and severally liable for the exemplary damages awarded against the individual defendants. The Acadia defendants sufficiently raised to the trial court the argument that Acadia and PRP could not be held jointly and severally liable for the specific exemplary damages found against the individual defendants. *Cf. In re B.L.D.*, 113 S.W.3d 340, 353 (Tex. 2003) (recognizing preservation-of-error rules support the "strong interest in ensuring that our trial courts have an opportunity to correct errors as a matter of judicial economy"), *cert. denied*, 541 U.S. 945 (2004); *Pirtle v. Gregory*, 629 S.W.2d 919, 920 (Tex. 1982) ("The reason for the requirement that a litigant preserve a trial predicate for complaint on appeal is that one should not be permitted to waive, consent to, or neglect to complain about an error at trial and then surprise his opponent on appeal by stating his complaint for the first time.").

48

In actions against multiple defendants, "an award of exemplary damages must be specific as to a defendant, and each defendant is liable only for the amount of the award made against that defendant." Tex. Civ. Prac. & Rem. Code Ann. § 41.006 (West 2015). Thus, the Acadia defendants assert that the lack of a specific amount of exemplary damages awarded against Acadia and PRP by the jury renders the joint and several exemplary-damage award improper under section 41.006.

In question 24, the jury found that the harm arising from the individual defendants' theft of trade secrets "resulted from malice attributable to" Acadia and PRP. The jury previously concluded that the individual defendants were acting in the course and scope of their employment with Acadia or PRP when they stole Horizon's property or trade-secret information and that Acadia and PRP ratified this conduct. But contrary to Horizon's contention, these findings do not allow a joint and several award of exemplary damages. *See Computek Computer & Office Supplies, Inc. v. Walton*, 156 S.W.3d 217, 223–24 (Tex. App.—Dallas 2005, no pet.); 2 John J. Kircher et al., *Punitive Damages: Law & Prac.* § 16:2 (2d ed. 2015). Thus, the trial court's judgment awarding exemplary damages jointly and severally was improper. We sustain this portion of issue five.

Although we agree that the joint-and-several nature of the award against Acadia and PRP was error as a matter of law, the remedy for such error is not as clear. Two appellate courts have remanded the issue to the trial court for a

49

determination of the amount of exemplary damages to be awarded against each individual defendant. *Andress v. Meah Invs. No. 2, Ltd.*, No. 01-07-00792-CV, 2009 WL 2882930, at *9–10 (Tex. App.—Houston [1st Dist.] Sept. 10, 2009, no pet.) (mem. op.); *Computek*, 156 S.W.3d at 224. However, both appeals were from bench trials, and the trial courts solely awarded exemplary damages jointly and severally, i.e., there were no individual awards of exemplary damages. Here however, Horizon proposed the jury questions regarding exemplary damages and specifically requested that the jury be asked to assign a specific dollar amount against each individual defendant but did not ask for a specific dollar amount against either Acadia or PRP. Because the jury charge, at Horizon's request, specifically asked for dollar amounts for exemplary damages to be awarded only against each individual defendant, we need not remand to the trial court "to determine whether to award exemplary damages as to any specific defendant." *Computek*, 156 S.W.3d 224; *see O'Hare*, 455 F. App'x at 382–83 (refusing to reverse joint award of exemplary damages because proposed jury question invited the joint assessment). The error in the form of the exemplary-damages award is its joint and several nature, not that it wholly failed to award exemplary damages against any defendant individually; thus, we are able to render an award that is not joint and several and appropriately awards amounts only against individual parties as the jury was charged and as allowed by section 41.006. *See* Tex. R. App. P. 43.3.

50

## D. ATTORNEYS' FEES

In their sixth issue, the Acadia defendants assert that Horizon is not entitled to recover attorneys' fees on its claims, Horizon failed to segregate its trial attorneys' fees, the evidence was insufficient to support the trial attorneys' fees, and the trial court erred by awarding appellate attorneys' fees after the jury found no appellate attorneys' fees were recoverable by Horizon. In its appeal, Horizon asserts in three issues that the trial court improperly reduced their trial and appellate attorneys' fees.

### 1. Relevant Facts

At trial, Horizon's trial counsel, Victor Vital, testified as to the amount, reasonableness, and necessity of Horizon's attorneys' fees and costs incurred through trial. The Acadia defendants objected to Vital's testimony regarding attorneys' fees, including the amount and the segregation percentage, because Horizon had not timely disclosed these details before trial. The trial court overruled this objection. Vital then testified that Horizon had incurred $875,789.50 in attorneys' fees and $156,291.18 in expenses "up to [the] date of trial." Vital opined that Horizon would incur between $100,000 and $150,000 in additional attorneys' fees and expenses through the conclusion of the trial. He testified that he excluded 25% of the attorneys' fees Horizon incurred because that percentage related to claims that did not support the award of attorneys' fees. To reach 25%, Vital reviewed the billing records and tried to determine which of the billing entries applied to each claim, some of which were

51

"inextricably covered." *See generally Tony Gullo*, 212 S.W.3d at 313 (holding attorneys' fees are not necessarily recoverable for all claims on basis of inseparability even if underlying facts are the same for different claims and even if attorney spent only nominal time on claim not entitled to attorneys' fees). He also testified that, in the event of appeal, Horizon would incur a total of $130,000 in appellate attorney's fees through appeal to the Texas Supreme Court. Vital did not segregate the appellate attorneys' fees.

After all parties closed, the Acadia defendants orally moved for an instructed verdict "on attorney's fees" based on the failure to segregate and on the absence of evidence regarding reasonableness. The trial court denied the motion. During closing jury arguments, Vital stated without objection that the total amount of trial attorneys' fees Horizon requested—$904,342.12[35]—had already been reduced by 25%.

The jury charge inquired as to attorneys' fees: "What is a reasonable fee for the necessary services of Horizon's attorney, stated in dollars and cents?" The question then specifically asked for a dollar amount for each phase of the case from trial through "the completion of proceedings in the Supreme Court of

---

[35]The record does not clearly show what this number represents because Vital's testimony was that Horizon had incurred $875,789.50 in attorneys' fees up to the date of trial with an additional $100,000–$150,000 through trial. We believe the number Vital used during closing jury argument reflects a 25% reduction of $1,**205**,789.50, which appears to be an inaccuracy of the amount of Horizon's attorneys' fees to the date of trial plus attorneys' fees for the duration of the trial: $875,789.50 + $150,000 = $1,**025**,789.50. Of course, Vital's closing jury argument was not evidence.

52

Texas." The Acadia defendants did not object to the submission of the attorney-fees question in the charge on the basis of nonsegregation. The jury awarded Horizon $900,000 "for representation in the trial court" but awarded no damages for appellate attorneys' fees.

Horizon filed a motion for entry of judgment on the jury's findings, requesting an award of $900,000 in trial attorneys' fees, and a motion to disregard the jury's finding on the issue of appellate attorneys' fees based on Vital's uncontradicted testimony. In the Acadia defendants' motions to disregard the jury's findings, they asserted that Vital's segregation testimony was conclusory and, thus, was insufficient to show appropriate segregation. The Acadia defendants alternatively argued that the award of trial attorneys' fees should be "$656,842.12 ($875,789.50 x 25%), not the $900,000 requested." The trial court entered final judgment awarding Horizon $769,342[36] in trial attorneys' fees and a total of $97,500 in appellate attorneys' fees.

The Acadia defendants summarily challenged the awarded attorneys' fees in their motion for new trial.[37] In its subsequent findings, the trial court explained its calculation of attorneys' fees: "Based on the trial testimony segregating

---

[36]It appears this amount is a 25% discount of the correct amount of attorneys' fees Horizon incurred through the end of the trial—$1,**025**,789.50.

[37]In a boilerplate section entitled "Points required by Rule 324(b)" in which they raised one-sentence challenges to each jury finding, the Acadia defendants stated that the trial attorneys' fees award was "excessive" with no further argument. *See* Tex. R. Civ. P. 322.

53

recoverable attorneys' fees from fees that were not incurred in connection with a claim for which fees may be awarded, the Court concludes that Plaintiff is entitled to attorneys' fees that are discounted by 25% and those discounted amounts are stated in the Final Judgment."

## 2. Entitlement

The Acadia defendants first contend in their sixth issue that Horizon cannot recover attorneys' fees on its breach-of-contract claims because the authorizing statute relied on by Horizon in seeking attorneys' fees—section 38.001 of the civil practice and remedies code—is preempted by the more specific Covenants Not to Compete Act. *Compare* Tex. Bus. & Com. Code Ann. §§ 15.51–.52 (West 2011), *with* Tex. Civ. Prac. & Rem. Code Ann. § 38.001 (West 2015).

We have concluded that the jury's damage awards for breach of contract were supported by legally insufficient evidence of future lost profits; therefore, section 38.001(8) cannot support Horizon's recovery of attorneys' fees. *See Mustang Pipeline*, 134 S.W.3d at 201 (holding plaintiff may recover attorneys' fees only if plaintiff prevailed on cause of action authorizing such fees and recovered damages). However, Horizon recovered under the Texas Theft Liability Act based on the jury's findings that the individual defendants intentionally stole Horizon's property or trade secrets as prohibited by penal code section 31.05 during the course and scope of their employment with Horizon, which Acadia and PRP ratified. *See* Act of May 26, 1999, 76th Leg., R.S., ch. 858, § 4, 1999 Tex. Gen. Laws 3537, 3539 (amended 2013 to remove

54

section 31.05 from purview of Theft Liability Act upon adoption of Uniform Trade Secrets Act) (current version at Tex. Civ. Prac. & Rem. Code Ann. § 134.002(2) (West Supp. 2014)).  The Theft Liability Act provides for the recovery of attorneys' fees.  Tex. Civ. Prac. & Rem. Code Ann. § 134.005(b) (West 2011). The Acadia defendants do not assert that Horizon could not recover attorneys' fees under the Theft Liability Act.  Accordingly, Horizon was entitled to recover its attorneys' fees.  We overrule this portion of the Acadia defendants' sixth issue.

### 3.  Alleged Errors in Amounts Awarded for Trial and Appellate Attorneys' Fees

The Acadia defendants argue in the remaining portion of their sixth issue that the trial and appellate attorney-fees awards were erroneous for multiple reasons.  Similarly, Horizon asserts in the three issues of their cross appeal that their attorney-fees awards were improperly reduced.  Because we have reduced Horizon's compensatory damages based on insufficient evidence of lost profits and concomitantly reduced the awarded exemplary damages upon a suggestion of remittitur, we need not consider these arguments.  The correct remedy in such a situation is to reverse the trial court's award and remand for a new trial on the issue of attorneys' fees.  *See Barker v. Eckman*, 213 S.W.3d 306, 313–15 (Tex. 2006); *see also Bossier Chrysler-Dodge II, Inc. v. Rauschenberg*, 238 S.W.3d 376, 376 (Tex. 2007); *Young v. Qualls*, 223 S.W.3d 312, 314–15 (Tex. 2007).

55

## E. SANCTIONS ORDER

In their seventh issue, the Acadia defendants argue that the trial court abused its discretion by ordering Saul to pay sanctions for pretrial discovery abuse.[38] As previously stated, the trial court entered a pretrial order sanctioning Saul for pretrial discovery abuse and ordered him to pay Horizon $41,780.80. *See* Tex. R. Civ. P. 215.2(b)(2), 215.3. The trial court further denied Saul's motion to reconsider the sanctions order and included the award in its final judgment. *See* Tex. R. Civ. P. 215.3.

The Acadia defendants argue that the sanctions order was based on Saul's breach of fiduciary duty as alleged by Horizon; thus, the failure of that theory of recovery on appeal (as also urged by the Acadia defendants in their appeal) results in "the same relief on the issue of discovery sanctions." But the trial court's sanctions against Saul were based on the breach of his duty as a party to preserve relevant evidence after Horizon filed suit against Acadia, PRP, and the individual defendants. *See Trevino v. Ortega*, 969 S.W.2d 950, 954–57 (Tex. 1998). The sanctions were not related to Horizon's ultimate success on its claim for breach of fiduciary duty against Saul. We overrule Horizon's seventh issue.

---

[38]The Acadia defendants do not challenge the trial court's inclusion of a spoliation instruction in the jury charge.

### F. POSTSUBMISSION BRIEF

The Acadia defendants seek leave to file a postsubmission brief to provide "additional record references, case authority, and analysis relevant to . . . three questions" posed by the panel at oral argument. Oral argument in this appeal was heard on November 4, 2014; however, the panel did not request postsubmission briefing. The Acadia defendants filed their motion for leave to file their postsubmission brief on December 1, 2014, which Horizon opposes. *See* 2d Tex. App. (Fort Worth) Loc. R. 1.C.

In their postsubmission brief, the Acadia defendants raise new issues and provide new record references and cases to support their previously-briefed arguments. Although some of the Acadia defendants' assertions in the post-submission brief are in response to the panel members' questions at oral argument, their postsubmission brief goes beyond merely answering those questions and strays into the impermissible territory of adding new issues to its appeal and shoring up issues that they did not brief as fully as they might have preferred. Further, the Acadia defendants already have filed approximately 125 pages of briefing—29,942 words—in this appeal. We recognize this is a complicated appeal but briefing must end at some point. This end point may certainly be set at oral argument. For these reasons, we deny the Acadia defendants' motion for leave and did not consider their postsubmission brief in our determination of this appeal. *See Black v. Shor*, 443 S.W.3d 154, 161 n.2

(Tex. App.—Corpus Christi 2013, pet. denied); *see also* Tex. R. App. P. 38.7; *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 65 (Tex. 1998).

## III. CONCLUSION

We conclude that the evidence of future lost profits was legally insufficient and the judgment for those amounts must be vacated. Although the evidence of theft of trade secrets, fraud, and fraud by nondisclosure was sufficient to support the actual damages tied to those claims, the exemplary-damage award was excessive in light of the vacatur of the lost-profit damages. Therefore, we reverse in part the judgment of the trial court awarding Horizon future lost-profit damages and render a take-nothing judgment on Horizon's claims upon which the jury awarded damages for future lost profits. We reverse that portion of the trial court's judgment awarding exemplary damages jointly and severally against Acadia and PRP and render judgment that the exemplary damages are not awarded jointly and severally against Acadia and PRP. We also reverse the trial court's judgment regarding attorneys' fees and remand for a new trial on attorneys' fees. *See* Tex. R. App. P. 43.2(a), (c), (d), 43.3.

We affirm the remainder of the trial court's judgment conditioned on the remittitur by Horizon of $649,015.20 in exemplary damages. *See* Tex. R. App. P. 46.3. Upon timely remittitur, we will reform the amount of exemplary damages awarded in the trial court's judgment and affirm the remaining portions of the judgment as reformed. If Horizon does not timely file the remittitur, we will reverse the trial court's judgment for a new trial on Horizon's claims upon which

58

Horizon prevailed and was awarded damages that were supported by sufficient evidence. *Soon Phat*, 396 S.W.3d at 95 (recognizing remand for new trial cannot be had solely on issue of exemplary damages).

/s/ Lee Gabriel

LEE GABRIEL
JUSTICE

PANEL:  LIVINGSTON, C.J.; WALKER and GABRIEL, JJ.

DELIVERED:  July 23, 2015